[Crim. No. 3738. In Bank.—July 2, 1934.]

THE PEOPLE, Respondent, v. CHARLES D. TEDESCO, Appellant.

S. S. Hahn, Harry Polglase and W. O. Graf for Appellant.

U. S. Webb, Attorney-General, and James S. Howie, Deputy Attorney-General, for Respondent.

WASTE, C. J.—Defendant was charged, by information filed by the Superior Court in· and for the County of Los Angeles, with the crime of murder, to wit, the killing of John W. Whitehead. He was tried before a jury, which returned a verdict of guilty of murder in the first degree, without recommendation. A motion for a new trial was made and denied, and thereafter judgment of conviction and sentence to pay the extreme penalty was pronounced. The appeal from the judgment and from the order denying a new trial is now before the court.

The prosecution contends that a motive for the killing of the decedent is found in the fact that the defendant's home was encumbered, and that he was in need of funds which he sought to raise through insurance he succeeded in having placed on the life of the decedent, with himself as the beneficiary.

No one saw the defendant and deceased together immediately prior to the killing. The evidence connecting the defendant with the crime is entirely circumstantial. The scene of the alleged killing was on the Redondo-Wilmington Boulevard, between three and four miles distant from Re-

dondo Beach, in Los Angeles County. Defendant conducted a shoe-repairing shop in the city of Redondo. Charles E. Pollard, who testified as a witness for the prosecution, had a shoe-shining stand in the shop, and also performed the necessary janitor work in and about the place. Another witness for the prosecution, Larry Ford, worked for the defendant a few weeks before the killing of the decedent, and slept in the shop at night. The defendant and each of these witnesses had a key to the shoe shop. John W. Whitehead, the deceased, an elderly man, frequently visited the shop. He and others addressed the defendant by the familiar name, "Charlie". For some time prior to his death, Whitehead had been employed as a dishwasher in a restaurant located near the defendant's shop. About six weeks before Whitehead was killed, John A. Jenkins, an employee of an insurance company, met the deceased, Whitehead, in the defendant's shop, the defendant having previously told Jenkins that he had a friend who wanted some insurance. On the occasion of Jenkins' visit, the defendant introduced him to Whitehead, who thereupon made application, through Jenkins, for a one thousand dollar life insurance policy. The arrangement was that the defendant would pay the necessary premiums on the policy. This plan was arrived at after it had been agreed that he might be made the beneficiary under the policy. The agreement was consummated through the execution of a "rider" on the policy signed by the deceased a few days before he was killed. The execution of this insurance policy, with the defendant named as beneficiary, is regarded by the prosecution as establishing the motive which led, it is claimed, to the killing of the decedent by the defendant.

The deceased, Whitehead, on the evening of July 18th, quit his work at the restaurant and left the place at about 8 o'clock, and about forty minutes later went back to get his glasses. As he left the last time, he was seen by the cashier of the restaurant to start across the street towards the defendant's shop, which was only about thirty feet distant. A little more than an hour later, the deceased was found lying about eighteen feet from the Redondo-Wilmington paved highway, about three and four-fifths miles from the defendant's shop in Redondo Beach. His head was badly cut and lacerated, and he was rolling back and forth

on the ground, moaning. He was removed to the emergency hospital, where he died that night. As he appeared to be becoming partly conscious before he passed away, he was asked what happened to him, or who hit him, and he gave a name with two syllables. His voice was so weak, however, that the witness could not get the name. The autopsy disclosed numerous cuts and lacerations on the head, a subdural hemorrhage covering the entire surface of the brain, and a compound fracture of the vault and base of the skull, which caused decedent's death. The autopsy surgeon testified that the injuries on the head of the deceased could have been caused by a blunt instrument, such as a hammer.

Between 9 and 9:30 o'clock on the night of the killing, people living on the Redondo-Wilmington Boulevard near where the decedent was found heard screams ''coming from the westerly direction''. Witness Westonhagen got in an automobile and drove about a quarter of a mile on the highway in that direction. He saw a car on the highway with its lights out. This car started up, came toward him, and passed him, going east. He was shown a photograph of the defendant's car, and testified that it generally answered the description of the car he saw that night. He further testified that at the time he heard the screams above referred to he also heard dull thuds that sounded to him like blows. After driving about a quarter of a mile and seeing nothing of a suspicious nature, he returned to his home, when the screams started up again. He was then joined by a police officer, Bennett, and together they drove westerly on the highway, and discovered what appeared to be a ''bundle of rags'' by the side of the road, which, on investigation, they found to be the deceased. Not only was the head of the deceased badly cut and bleeding, but there was blood on the ground near the body and on several tree stumps nearby. At the side of the highway, almost opposite the body, they found a large pool of blood and a beer bottle ''with a Golden Glow label''. Nearby they also found the decedent's cap and glasses. The decedent was in a semi-conscious condition, and frequently called, ''Help—police!'' About 160 feet from the highway, there was a road shack, which, on the night of the killing, was occupied by a tramp by the name of Mitchell. He testified that he went to sleep about 7 o'clock, and was awakened later by a noise, and heard a

man cry out, "Don't kill me, Charlie", which he said was repeated many times.

On the morning following the killing, a deputy sheriff found a shoemaker's hammer with a broken handle, and a blood-stained handkerchief where the body of the decedent had lain. The handle of the hammer was covered with a red, sticky substance. At the trial, this hammer was identified by the witness Pollard [who was the janitor at the shop] as the hammer which the defendant kept in the rear of his shop on the bottom shelf of his show-case. He testified that he had seen three shoemaker's hammers in the shop prior to the morning of the murder, but on the morning following the killing he made an investigation, and found there were but two. Witness Pollard also testified that there were a number of bottles of beer of the brand known as "Golden Glow" in the defendant's shop on the night previous to the murder, and that on the morning thereafter there was one less bottle. At this point it may be noted that the bottle found beside the place where the body of the decedent lay bore fingerprints of the deceased, but no others were established. The automobile owned by the defendant, found at his home after the killing, was a Chevrolet sedan, highly polished. Across one front door there were a number of streaks. It appeared as though they had been caused by the door having been recently wiped off, and on various parts of the car, both inside and out, numerous spots were found. A chemical analysis of one of these spots determined that it was human blood. The witness who so testified said that by chemical analysis he determined that there was human blood on the hammer found at the scene of the crime.

There was considerable testimony concerning the movements of the defendant on the evening of the killing (July 18th). It was a warm night. According to the witnesses, defendant got into his automobile, and left his shop about 7 o'clock. A police officer (Carter) saw him about 9:20 that night in his automobile and wearing a heavy overcoat. He explained to the officer that he was not feeling well. A half-hour later, the same witness met defendant in a drug-store near the defendant's shop. He still had his overcoat on. He hurriedly drank two glasses of water, pushed back his hat, ran his finger across his forehead, and drops of perspiration ran off the finger. He showed the witness a

note which he said he had found under the door of his shop. It was to the effect that the deceased had "gone back East". At the same time, defendant called the deceased a vile name, and added, "He owed me a few dollars." At that time he also showed the note to the witness Schultz, the druggist. At about the same time, the defendant met a confectioner (witness Stamas), whose store was located next to the shop of the defendant, and said to him, "Johnny [referring to the deceased] left Redondo", at the same time showing Stamas a note which he gave him to read. Stamas did not identify the exhibit (People's No. 24), as did the other witnesses, but, in a conversation, defendant said to him that he was sorry he gave him, the decedent, five dollars, and remarked he did not believe he would see him any more, but "guessed" he was going to lose his five dollars. He apparently sought to impress Stamas with the fact that he had been sick all day, and the witness noticed that the defendant at that time was "in perspiration and also kind of red". Later in the evening, the defendant telephoned to the witness Sheeley, the proprietor of the house in which the deceased, Whitehead, roomed, and read a note over the telephone, telling Sheeley that "Johnny had left the note on his desk in the shoe shop", the note purporting to recite that "Johnny" had been called out of town, had left in a hurry; and that he was the man who owed the defendant. About 11 o'clock that night, the defendant called Doctor Shea to his home, claiming he was ill. The doctor found nothing pathologically wrong with the defendant, and did not take his temperature. The defendant showed him the note he had previously exhibited to the policeman and others, stating at the time that Whitehead had left town owing him five dollars.

Testimony was introduced by the prosecution regarding the amount which the defendant at various times claimed the deceased owed him. The prosecution regards this as very material. In a statement to witness Raymond, connected with the insurance company, defendant represented that the decedent owed him approximately seven hundred dollars. To other witnesses, the defendant stated that decedent owed him small amounts, "either $2.90 or $3.90". The decedent had paid him at one time fifty cents. At other times, he was sorry he gave the decedent five dollars.

On the morning following the killing, in conversation with Chief of Police Peterson, of Redondo, and two deputy sheriffs, the defendant sat in a chair "perspiring profusely". He showed the officers the note he had shown to others (People's Ex. No. 24). At that time, he told the chief and others present that Whitehead owed him either sixty or eighty dollars. Other testimony was to the effect that about 10 o'clock on the evening in question defendant, in his Chevrolet car, was driving on the highway at a high rate of speed. He later drove into a filling station, asking for air and water, but did not wait for either. A handwriting expert (witness Sellers) testified that in his opinion the note in question (People's Ex. No. 24), displayed by the defendant to various persons, was not all written at the same time nor under the same writing conditions. In his opinion, the paper on which the note was written had come from a pad which was found in the shop of the defendant, and the paper was in and a part of the pad when the note was written.

The prosecution contends that this evidence discloses that the defendant deliberately planned to have himself named the beneficiary under an insurance policy issued on the life of the decedent, under which, in case of accidental death, the policy would pay double indemnity; that, in order to establish an insurable interest in the life of the decedent, he represented to the company that the deceased owed him approximately seven hundred dollars, which, according to subsequent statements to various other persons, was manifestly a grossly exaggerated amount; that, in order to realize upon the policy he took the decedent in his automobile, drove a distance of approximately four miles from his shop, and there, by repeated blows of the hammer upon the head of the deceased, caused injuries which, a few hours later, resulted in the decedent's death; that defendant's subsequent actions, immediately following the beating of Whitehead, his efforts to establish that decedent had left town owing him money, and his appearance that night and before the officers on the morning following the killing, unquestionably tend to show a consciousness of guilt. The jury accepted the theory of the prosecution and returned its verdict carrying with it the extreme penalty. The defendant did not take the stand at the trial. Evidence was intro-

duced that prior to the homicide his general reputation for peace and quiet was good.

■ On the record, the prosecution contends, there is substantial evidence tending to support the verdict of the jury, and that this court cannot, as a matter of law, substitute its judgment on the facts for that of the jury. No rule of criminal law and procedure is better established in this state. It is the function of the jury, in the first instance, and of the trial court after the verdict, to determine what facts are established by the evidence and, before the verdict of the jury which has been approved by the trial court can be set aside on appeal upon the ground of the insufficiency of the evidence to support it, it must be made clearly to appear that upon no hypothesis whatever is there substantial evidence sufficient to support the conclusion of the trial court. (*People* v. *Tom Woo,* 181 Cal. 315, 326 [184 Pac. 389].) This court has uniformly held that where there is evidence tending to support a verdict we cannot disturb the verdict upon the ground that it is not sustained by the evidence; and the application of this rule is strengthened in a case where, as here, the trial court has refused a new trial. It is settled beyond controversy that the weight to be accorded the evidence is a question for the jury. (*People* v. *Ellis,* 188 Cal. 682, 688 [206 Pac. 753].) ■ The finding of the jury in this case was approved by the trial court on motion for a new trial. The findings of the jury and the trial judge on this subject are conclusive upon this court. It may disturb such a finding only when we can say, as a matter of law, that there was no evidence to support it. (*People* v. *Erno,* 195 Cal. 272, 283 [232 Pac. 710].) After reaching this conclusion as to the sufficiency of the evidence, it becomes necessary to carefully examine the various contentions advanced by the appellant as to alleged errors of law occurring during the trial.

■ There was testimony, already referred to, that the witnesses Pollard and Ford each had a key to the shoe-repairing shop of defendant. Ford disappeared immediately after the killing of the decedent, and was not seen until he appeared for the trial. On the theory, we may conclude from the record of the cross-examination of some of the witnesses for the People that it would be argued to the jury by the defense that an accomplice or a co-conspirator

might have committed the killing, the prosecution submitted, and the court gave, certain instructions which correctly defined an accomplice and co-conspirator, and stated the law governing the guilt of the defendant if he participated in the commission of the crime, though actually accomplished by such accomplice or co-conspirator. No complaint is made that these instructions incorrectly stated the law. In defendant's brief it is admitted "that no confederation or conspiracy was charged or proven". We are therefore of the view that the giving of the instructions was harmless.

■ Complaint is made that, after giving these instructions, the court refused to give instructions on the same subject requested by the defense. These instructions impress us as being somewhat argumentative and relating to matter sufficiently covered by the court in the other instructions. In view of the evidence and of the entire charge given to the jury, we are of the view that the court was not required to give any instructions on the subject. Those given were not prejudicial to the defendant.

■ The giving of instructions by the trial court in the language of section 189 of the Penal Code was not prejudicial. The evidence in this case, if accepted, discloses that the killing of the decedent by defendant was wilful, deliberate and premeditated, and therefore, under the section, murder of the first degree. The jury was fully instructed on the doctrine of the presumption of innocence and of reasonable doubt, and, at the request of the defendant, sufficiently instructed on the question of circumstantial evidence and the manner in which it is to be weighed by the jury. The jury was properly instructed by the court upon all phases of the law applicable to the facts in this case. That being so, the defendant was not entitled to have instructions on like matters given in a particular phraseology.

Certain alleged errors of the court in the decision of questions of law arising at the trial are complained of. ■ Whether or not the decedent told Mrs. Bertha Foster where he was going when he left the restaurant in the evening just prior to the killing was immaterial in view of the fact that what he told her was not testified to before the jury.

■ A chemist, Abernathy, testified that he examined for blood-spots certain clothes which he understood to be those worn by the defendant on the night of the homi-

cide, but found no such spots. The prosecution stipulating there was no blood on the clothing, the court held that its production in court was unnecessary. Subsequently, after the People had closed their case, a discussion arose as to the color of an overcoat. The prosecution offered to bring the coat into court, and counsel for the defense said, ''Let it stand as it is; I am satisfied.'' No error can be predicated on this incident.

█ We find no merit in the contention of appellant that the district attorney commented before the jury on the failure of the defendant to take the stand. The district attorney's remarks, in declaring that witnesses Ford and Pollard were not afraid to take the witness-stand and subject themselves to cross-examination, cannot, in our estimation, be interpreted as the appellant contends. Furthermore, no assignment of misconduct was made, and no request was made by the appellant that the jury be instructed to disregard the remarks objected to. The jury was advised in the charge that, if the defendant in a criminal case does not testify, his failure to do so shall not be taken as a circumstance against him. We therefore find no error. (See *People* v. *Nakis,* 184 Cal. 105 [193 Pac. 92].)

█ Character witnesses for the defendant testified that the general reputation of the defendant for peace and quiet was good. On cross-examination, the district attorney asked them whether or not they heard or knew that the defendant had struck his sixty-two year old father in the face. Most of them answered in the negative; one was not certain. No error was committed in permitting the cross-examination. (*People* v. *Gayle,* 202 Cal. 159, 165 [259 Pac. 750].) █ It appeared that during the trial one of the jurors made an unauthorized visit to the scene of the crime. Such visit was an irregularity, but does not constitute misconduct warranting the granting of a new trial, unless prejudice is shown to have followed therefrom. (*People* v. *Rowell,* 133 Cal. 39 [65 Pac. 127].) No such showing is made here. Appellant admits this to be the true rule, but argues that, in view of the errors of the court complained of by him and heretofore discussed, including the alleged misconduct of the district attorney and the alleged insufficiency of the evidence, the court should have granted the motion for a new trial. In view of the conclusions

reached and announced in our consideration of these matters, we are of the view that the trial court did not err in its refusal to grant the motion.

The order denying defendant's motion for a new trial and the judgment are, and each is, affirmed.

Shenk, J., Curtis, J., and Thompson, J., concurred.

LANGDON, J., Dissenting.—I dissent. The evidence in this case was purely circumstantial, and in my opinion insufficient to justify the verdict of guilty of murder in the first degree.

Rehearing denied.

Preston, J., and Langdon, J., dissented.