[Crim. No. 2438. First Dist., Div. One. Apr. 8, 1947.]

THE PEOPLE, Respondent, v. MEROLD HIDALGO, Appellant.

Leslie C. Gillen for Appellant.

Fred N. Howser, Attorney General, and Ralph W. Scott, Deputy Attorney General, for Respondent.

BRAY, J.—Appeal from judgment of conviction for violation of section 261 of the Penal Code and section 702 of the Welfare and Institutions Code, and from the order denying the motion for new trial.

Appellant does not question the sufficiency of the evidence to support the verdict of the jury, but bases his appeal on two grounds: (1) Alleged error by the court in omitting two of defendant's proposed instructions; and (2) alleged misconduct of the prosecuting attorney.

The information charged defendant with violating section 261 of the Penal Code by an act of sexual intercourse with Johanna Nellen, a girl of the age of fourteen years, not his wife, on April 3, 1946 (a date changed by amendment of the information from April 9), and with violating section 702 of the Welfare and Institutions Code on the same day by taking Johanna Nellen to a room in a San Francisco hotel, thereby causing her to become and remain "A person under twenty-one years of age who is leading or from any cause is in danger of leading, an idle, dissolute, lewd, or immoral life. . . ." Appellant pleaded "not guilty" to both counts.

The defendant is a Filipino; the complaining witness a white girl. The latter lives with her father on Orienta Street in Bayshore City, San Mateo County. Next door, defendant lives with his white wife Evelyn, whom he married shortly after his arrest, and two children—his child by a former marriage, and her child by a former marriage to another Filipino.

The prosecutrix testified as to her age and that she was not married to defendant, and as follows: She had met defendant the preceding November. On the day in question, when she came home at noon recess from the Bayshore Elementary School, defendant phoned her, stating that he wanted her to help him look for his wife, Evelyn, and that he would pick her up at 2 o'clock at the "P. G. & E." (the power plant about a block from Johanna's school). She returned to school and remained until 2 o'clock. When she came out defendant

was waiting for her at the designated spot. She got into his car with him and he drove her to the Broadmoor Hotel in San Francisco. They entered the back entrance of that hotel. Pictures of the hotel and this back entrance were identified by prosecutrix. Defendant took her in the elevator from the basement to the fourth floor bathroom, pictures of which she identified. Defendant asked her if he could have sexual intercourse with her, and she consented. The act was consummated and defendant gave her a dollar and told her to go home. She left the hotel by the back entrance, taking a streetcar and bus to her home, arriving there at 5:30. The first person she told about the affair was the principal of her school, Miss Fitzgerald, whom she told the next day. Previously she had told the principal of her sex relations with other men. On the 13th of April, prosecutrix went to Placerville for her Easter vacation, and while there told her aunt about what had happened. Before she went to Placerville defendant phoned to her again and wanted her to come down again with him. She said that she would, but she did not go. He again phoned her asking her to see him before she left for Placerville, and then asked her to take off the first day of her return to school and go with him to the Broadmoor Hotel. He told her that "if I told anybody, even told Evelyn or anybody, he would cut my neck."

On the first day of her return from her vacation, about noon, she went to the vicinity of the P. G. & E., where the defendant was supposed "to pick me up." She was accompanied by two police inspectors. Shortly thereafter defendant drove by the place in his automobile and on into the driveway of his home, where the inspectors arrested him.

On cross-examination, in an endeavor to show motive, defendant brought out the fact that prosecutrix had several times been scolded by defendant's wife for sitting in cars in front of defendant's home with Filipino boys. She had also been told by other women in the neighborhood not to sit in cars with Filipinos. Prosecutrix had on many occasions eaten dinner with the defendant and his wife, and on about five occasions her father had also eaten dinner with her there. Then because she was spending so much time at Hidalgo's house her father complained that he did not like to eat alone. In March, defendant's wife stopped inviting prosecutrix to dinner. Prosecutrix denied that she became angry over this,

but her feelings were hurt and she resented it. She admitted that she had told the authorities that Mrs. Hidalgo had set traps for her in her house, so that Filipino boys would be there when prosecutrix went in, and these boys would have relations with her. She knew that there was no one home at the Hidalgo house during the day, as Hidalgo worked at the Broadmoor Hotel, Mrs. Hidalgo worked at Christine's Restaurant, and the two Hidalgo children were at school. Defendant's wife had asked her to empty the ice box. To get in for that purpose, as well as to meet the Filipino boys, prosecutrix would put her arm around through the window and unlatch the door. Defendant and his wife introduced prosecutrix to Filipino boys who gave her presents.

The two police inspectors testified to being parked in a car with Johanna on April 22d, on Orienta Street, not at the point of the rendezvous testified to by Johanna, although they could see the P. G. & E. from where they were parked; that defendant drove by, was pointed out by Johanna, and the arrest was made as soon as defendant drove into his driveway. One inspector stated that the reason defendant gave for coming home at noon was that his car needed fixing.

Miss Dorothy Fitzgerald, principal of the Bayshore School, a witness for the People, testified that Johanna left school without permission on April 3d, between 2 and 2:20 and did not come back. Her teacher reported that fact to witness, who thereupon wrote a note to Johanna's father telling him about it. The next day Johanna brought this note back with an excuse on the bottom. Apparently not believing the excuse, the witness said to Johanna, "Now tell me the truth." After fifteen or twenty minutes of conversation Johanna apparently told witness what had happened the preceding day. On April 12th, the day before Easter vacation, witness saw defendant driving his car very slowly, circling the school grounds, continuing to do so until 25 minutes after 1. It does not appear in her testimony what time he first came out or how long he was there. Witness made a note of his car license number. On cross-examination witness testified that Johanna had been truant from school four or five times and that her father did not seem to think her conduct was his responsibility.

Mrs. Evelyn Hidalgo, the defendant's wife, called as a witness for defendant, testified that she married defendant after his arrest. She worked at Christine's Coffee Shop on Franklin

Street in San Francisco, about two blocks from the Broadmoor Hotel, where her husband worked as a room boy. Defendant had a half hour from his work, and daily came to Christine's for lunch at 12 noon. She always had his place set up at the end of the counter, and had a meal ticket there for him. He would remain there after he finished eating, helping with the dishes and other things. Defendant came to Christine's for lunch on April 3d. In October, witness had taken Johanna with her and three of the latter's relatives to the Broadmoor Hotel to get the car keys from defendant. They, including Johanna, went in the back way to the hotel, as Mrs. Hidalgo had on her working clothes and did not want to pass through the lobby, and into the room referred to by Johanna as a waiting room. They then went in the elevator to she thought the second floor, and thence to the bathroom. The bathroom they went to looked like the fourth floor bathroom, as shown in the pictures in evidence. Witness then told of the frequency with which Johanna and her father had formerly come to her home and later at the father's request of stopping Johanna from coming there. Johanna was boy crazy and would put her arms around the Filipino boys with whom she had become "pretty well acquainted" at witness' home. She told of scolding Johanna for sitting in automobiles with Filipino boys who temporarily lived at her house. Johanna did not like the scoldings, became very angry, and would go home. The neighbors were not friendly with witness. The reason she reprimanded Johanna for sitting in the car with Filipinos was because Johanna was too young and "I knew our neighbors out there was against us, and we didn't want to do anything that would make them treat us any worse than the way they were treating us." She had also scolded Johanna three times for being absent from school. Explaining why defendant was not at work on April 22d (the day of his arrest and the day, according to the testimony of prosecutrix, defendant had asked her to meet him again), witness stated that defendant went out in the Mission to have his car fixed and was supposed to get her clothes, which she had forgotten that morning, bring them to the restaurant, and take her to the doctor. Her appointment with the doctor was around 2:30. On the question of motive, witness testified that she was arrested on Johanna's complaint in San Mateo, Johanna claiming that witness had set a trap so that Filipino boys would meet Johanna alone in witness' house.

To prove an alibi, defendant called Mrs. Rosalie Hugo and Ben Unruh. Mrs. Hugo testified that for three years she had been the assistant executive housekeeper at the Broadmoor; that defendant worked under her direct supervision, and that she kept books on the records of employment and tasks and duties of the employees, including defendant. She produced the time book showing the working hours of defendant and his coworker Sam. From her books she stated that both boys worked April 3d. From the assignment book she testified that they were cleaning the venetian blinds, polishing the floor and walls, cleaning the lobby in general. She also listed the rooms cleaned by defendant on April 3d. That was the last day of work for Sammy. He used too much "purex" in the water and developed a rash on his arms and they sent him to the doctor. Witness saw the houseboys every 15 minutes or half hour throughout the day. On cross-examination witness denied that the boys leave the building at any time during the daytime. She did not see how defendant could possibly have left the hotel on April 3d, for over half an hour; she would have known if he left for more than that. She testified that defendant was off April 22d. On cross-examination it appeared that in accounting for the days the witness used a numeral system rather than the day of the week, and the record book showed that April 3d, was a Wednesday and that the 22d was a Sunday. (Actually April 3d was a Tuesday and the 22d was a Monday.)

Ben Unruh testified that he had worked four years at the Hotel Broadmoor, and that for the last five months continuously he had been manager. On April 3d, Sammy and defendant were working in the lobby where witness conducted his business as manager. The boys that day were under the witness' observation. The two boys were cleaning the venetian blinds and owner's office. Sammy used too much "clorox"; his hands broke out in a rash, and he had to be sent to the doctor. It is not clear from the witness' testimony whether Sammy went to the doctor on the third or the fourth. Sammy reported that the doctor told him he could not work, so Sammy did not work from the 4th until the 15th. Witness watched them clean the chandelier in the owner's office. It must have been after one o'clock that they were working on the venetian blinds. Witness was not asked how long into the afternoon the boys worked.

Defendant, testifying in his own behalf, after telling of the acquaintanceship of Johanna and her father with defendant and his family, substantially as testified to by Johanna, stated that several times defendant asked Johanna not to come to his house because he heard that the neighbors had told her not to associate with "us." Johanna acted "mad." On April 3d, defendant took his lunch hour from 12 to 12:30. Upon returning from lunch, he cleaned the venetian blinds in the lobby, working with Sammy from about 1 o'clock until 3 o'clock; then defendant helped Sammy bring down the garbage. Defendant quit at 4 o'clock—his regular quitting time. He did not leave the hotel from 1 to 4:30, nor did he drive out to Bayshore City. To drive from the Broadmoor Hotel to Bayshore City takes 45 minutes. The round trip would take an hour and a half. Defendant denied picking Johanna up in the car or bringing her to the hotel or having sexual intercourse with her. He testified that Johanna had been to the Broadmoor only once, on the occasion when she accompanied his wife who came to get the automobile keys; that she never was at the Broadmoor alone with him. Defendant denied circling the Bayshore School on April 12 (the day the school principal testified to seeing him). He had to pass the school on Orienta Street going to his home, which was a couple of blocks up Orienta Street from the school. On no day did he ever circle the school. April 22d, the day he was arrested, he did not go to work because he went to have the gas tank on his car welded. He asked Mrs. Hugo's permission to take the day off to have his car fixed. That morning he drove the children to school near Christine's restaurant and took his wife to the restaurant. She requested him to pick up a dress for her and bring it to the restaurant so she could go to the doctor. After the car was fixed he went home to get the dress, where he was arrested. There was admitted in evidence a bill, dated April 22d and marked paid, for work done on and for welding a gas tank. Defendant denied ever telephoning to Johanna, or threatening her, or making an appointment to meet her on her return from her vacation. Sammy, whose hands were swollen and itchy, went to the doctor on the 4th of April. (Mrs. Hugo testified the boy went to the doctor on the 3d.) Defendant never went home at noon; he always went to Christine's restaurant for lunch.

.To overcome the effect of the defendant's purported alibi, the prosecution called Mrs. Evelyn Merrifield and Mrs. Lela Silva. Mrs. Merrifield testified that she lived next door to the defendant's home and saw defendant at his home at noontime various days between March 31 and April 17. The witness would not definitely state how many times. Witness had heard Mrs. Hidalgo call Johanna over to her house at the time Filipinos were in the house. (Mrs. Hidalgo in her testimony had denied doing this.) On cross-examination witness admitted that she had complained to the real estate people to prevent the Hidalgos from purchasing their house and resented very sorely that a Filipino with a white wife was living next door to her; that "she had ignored" them completely. She complained to the S.P.C.A. that the Hidalgos had left their dog in the back yard in the rain and without food or water.

Mrs. Silva testified that she lived on Orienta Street two houses down the hill from defendant's house. In the early part of April she saw the defendant around his home at noontime many times, but could not give the exact number of times, nor any specific date. Witness did not particularly resent the Hidalgos living near her property, and neither liked nor disliked them. Witness asked Johanna's father to keep his daughter away from the Hidalgos because she did not think it was a fit environment for a fourteen-year-old child to be among all those men—witness did not like what she observed "going on there." She said that she noticed that Johanna stopped playing with other children in the neighborhood and witness did not feel that it was right for Johanna to spend so much time over at a place where there were so many Filipino men.

### The Instructions.

Defendant complains of the failure to give two of his offered instructions, Numbers 4 and 2. Written instructions were waived by counsel and the court delivered an oral charge. The clerk's transcript, with the exception of defendant's proposed instructions Numbers 3 and 9, hereinafter mentioned, does not give the instructions which were given by the court, but only the rejected instructions. The reporter's transcript does not contain any of the court's charge to the jury, but does contain the following statement of the court: ". . . let the record show that of Mr. Gillen's proposed instructions on behalf of the defendant, I gave Instructions Nos. 3 and 9. . . . The others were all covered, Mr. Gillen. I covered all that

you gave me." Nor does defendant's brief cure this situation.

Rule 33(b), Rules on Appeal, provides: "The appellant may request the inclusion in the record of any of the following: . . . (2) In the reporter's transcript: . . . (e) instructions given, which cannot be copied by the clerk; provided, however, that *if error is urged as to the giving, refusal or modification of instructions, the reporter's transcript shall include all instructions given* which cannot be copied by the clerk." (Emphasis added.) (In view of the specific provisions of rule 33, rule 52, Rules on Appeal, hereinafter mentioned on another subject, does not apply to instructions.)

In *People* v. *Jacobs,* 11 Cal.App.2d 1, the court states at page 14 [52 P.2d 945]: "Appellant complains that the trial court erred in the instructions which it gave to the jury and that it improperly refused to give forty-four instructions which he offered. In presenting this contention appellant's brief on appeal refers to these instructions by number and by very incomplete suggestion of their contents without in any instance presenting the full text of the instruction. Nor has appellant presented, in connection with instructions claimed to have been erroneously refused, other instructions given by the court bearing upon the subjects covered by the refused instructions. It is therefore evident that appellant has failed to comply with section 3, rule VIII of the rules governing practice in this court and in the absence of more definite criticism we are justified in the belief that the instructions given by the trial court were free from serious error and that instructions which were offered by appellant and refused were properly refused." In *People* v. *Von,* 78 Cal. 1 [20 P. 35], it is said (page 3): ". . . while the judgment roll in the case at bar contains the written charges *presented* and indorsed 'given' or 'refused,' it also shows that there were other oral instructions given by the court to the jury, but does *not* show what those instructions were. We are asked, therefore, to reverse the case, because a particular written instruction presented by appellant is marked 'refused,' while we are informed that there were other instructions not in the record, and are not informed that the instruction refused (or that part of it which was correct) was *not* given in those instructions. An appellant must show error affirmatively and clearly. It might be argued that the prosecution should have shown that the 'refused' instruction was given elsewhere. But how could the prosecution have done so? The defendant had entire control of the appeal, and chose to make it upon the judgment

roll alone.'' The court relied upon Penal Code, section 1207, as it read in 1888, when it required that charges given and refused be included in the record. Although this requirement has been deleted, a similar requirement is found in rule 33 of the Rules on Appeal above quoted. In view of appellant's failure to produce the entire charge and of the court's statement to the effect that the subject matter of the rejected instructions was covered elsewhere, this court must assume that the subject was fully covered.

However, regardless of that situation, we believe from an examination of the two instructions included in the clerk's transcript which were given, that there was no error in omitting the rejected instructions.

Defendant's proposed instruction Number 4 which the court marked ''covered,'' and refused to give, reads as follows: ''If there is a reasonable doubt as to the credibility or reliability of any witness whose testimony is necessary in order to convict the defendant, even though the testimony of such witness may be uncontradicted, such reasonable doubt is sufficient to acquit the defendant.'' The court did give defendant's proposed instruction Number 3, which read: ''If you have any reasonable doubt as to the credibility or truthfulness of any statement made by any witness against the defendant, you must resolve that doubt in favor of the defendant and find such statement to be untrue.'' A comparison of the two instructions shows that they treat of the same subject matter and are practically duplications. (We are assuming from the foregoing authorities and from the failure of defendant to claim otherwise that the court gave the usual instructions on reasonable doubt.) Coupling instruction Number 3 with the usual instructions on reasonable doubt, this court cannot say that the subject matter of instruction Number 4 was not sufficiently covered by the court.

The other instruction of whose failure to give the defendant complains was defendant's proposed instruction Number 11, which reads as follows: ''You are further instructed that the defense of an alibi as it has been defined for you, is a legitimate and proper defense recognized by the law, and is not to be confused by you with the use of the word 'alibi' by lay persons outside of the law to mean an unmeritorious excuse or evasion.'' The court marked that ''covered,'' and did give defendant's proposed instruction Number 9 which reads: ''When evidence is offered by the defendant in a criminal case indicating or tending to establish that he was else-

where than at the place where the crime is alleged to have been committed at the time it was alleged to have been committed, this is known in the law as an alibi. In offering an alibi, the defendant is not obliged to establish that defense beyond a reasonable doubt or even by a preponderance of evidence, but it is sufficient to entitle him to a verdict of not guilty if the proof raises in the minds of the jury a reasonable doubt as to the presence of the defendant at the place where the crime was alleged to have been committed at the time the crime was alleged to have been committed.'' It would appear that instruction Number 9 fully covers the subject of ''alibi.'' Appellant produced no authority for the proposition that, in addition to fully defining what an alibi is, the court must further distinguish the legal definition from an alleged ''lay'' definition. In comparing the two instructions we can find no error in omitting one of them. Especially is this so, when we are deprived of the opportunity to examine the instructions as a whole.

The language in *People* v. *Cruse*, 24 Cal.App. 497 [141 P. 936], on the subject of instructions is particularly appropriate here (page 501) : ''A great many instructions offered by the defendant were refused, many of which might well have been given by the trial judge in order that the defendant might have had the benefit of a more detailed statement of the propositions material to be submitted given to the jury. It is said by the Supreme Court in the case of *People* v. *Baldwin*, 117 Cal. 249 [49 P. 187], in discussing a case similarly conditioned as to the evidence : 'In this class of prosecutions the defendant, owing to natural instincts and laudable sentiments on the part of the jury, and the usual circumstances of isolation of the parties involved at the commission of the offense, is, as a rule, so disproportionately at the mercy of the prosecutrix's evidence, that he should be given the full measure of every legal right.' An appellate court, however, in considering the matter of the instructions given and refused will not reverse a case where it appears that the court has stated in a generally clear, though brief form, the propositions of law applicable to the issues tried.'' ''The defendant in any given case is not entitled, under the section of the code which permits the submission to the court of the defendant's requested instructions, to have his own particular phrasing of the law adopted by the court and given to the jury. All that he is entitled to is to have the substance of the law applicable to

his case set forth by the court correctly in its instructions. . . .''
(*People* v. *MacPhee*, 26 Cal.App. 218, 221 [146 P. 522].)

### Misconduct of the District Attorney.

A more serious situation is presented with reference to the claimed misconduct of the district attorney. In his closing argument he stated: ''. . . I have an abiding faith and confidence in little children; I believe strongly in their wisdom, intelligence, integrity and truthfulness; and I am willing to stand upon it. *But I am willing to go further, and I always do go further.* When Counsel tells you we are rushed out here, and we are busy out here, that is true; but when he says we don't take enough time, or infers that we don't give sufficient time to preparing our cases, then he is wrong; then he is completely wrong. I have spent plenty of time on this case; *I know every in, out, quirk and little incidental about this defendant, and about every witness who appeared on this stand. I spent hours down in that neighborhood; I spent time at the school questioning the teachers; I spent time on records, marriage certificates, correspondence. No, I am deadly, absolutely certain, and there is not a scintilla of doubt in my mind.* It is not a question of being rushed, and *it is not a question of prosecuting somebody when you are not convinced of his guilt. I have stood in this courtroom— and I will do it again whenever the occasion arises—and tell you ladies and gentlemen of the jury that I don't think you should convict the man; I don't think he is guilty—when I don't think he is—and I have done just that right here.''* No objection was made to this at the time. Later, the district attorney said: ''Ladies and gentlemen of the jury, I know you are tired but, as Counsel told you, he feels a responsibility in these cases, I, too, feel a responsibility; not that it makes a difference of one iota in my salary; it doesn't. I will be trying a case here tomorrow, and another the day after that, and I prepare them and work hard on them, *and any time I am not absolutely convinced of the guilt of a defendant brought into this courtroom here, I pledge you my word of honor, I will tell the jury about it.''* Thereupon, the following occurred: ''MR. GILLEN: Just a moment. I am going to assign that as misconduct. The Supreme Court has held that as misconduct and as cause for a mistrial, and I request a mistrial of this right now, in accordance with the decisions of our Supreme Court. MR. MULLINS: No, Your Honor, I was very careful not to have phrased it in that manner. I was

speaking in generalities. Mr. Gillen: I ask Your Honor for a ruling and to admonish the jury, and that that not be considered. Mr. Mullins: I have no hesitation, ladies and gentlemen of the jury, in asking you to return a verdict of guilty as charged. Mr. Gillen: Will Your Honor act on my motion. The Court: Yes; I admonish the jury to disregard that statement of counsel's relative to cases in which if he is not convinced; you will disregard it; I grant that that far.'' (Emphasis added.) Both of these statements are cited by defendant as prejudicial misconduct. Respondent does not contend that they do not constitute misconduct other than to say that they ''seem to be in the nature of a reply to the argument advanced in behalf of the defense,'' but he does not refer to any specific statement in this respect claimed to have been made by defense counsel in argument. He does contend that appellant cannot challenge the first statement because appellant made no objection to it in the lower court, and that the conduct was not prejudicial to the rights of the defendant, under section 4½ of article VI of the Constitution, and the instructions of the court.

There can be no question but that those portions of both statements in which the district attorney stated in effect that if he did not think the defendant guilty he would not prosecute him, are misconduct. As said in *People* v. *Chilcott*, 18 Cal.App.2d 583, at page 588 [64 P.2d 450] : ''With reference to the remaining statements included in the group now under consideration in which the prosecutor referred to the fact that he had never prosecuted or attempted to convict anyone of a crime unless he thought such person was guilty and that he conceived that it was his duty to prosecute if he believed that the evidence warranted such action, it must be conceded that these remarks were improper and should not have been made. As was correctly stated in *People* · v. *Podwys*, 6 Cal. App.2d 71, 74 [44 P.2d 377] : 'There can be no excuse for such comment.' ''

While the argument of the defense is not before us (the reporter's transcript shows it was not reported), the highly objectionable portions of those statements do not appear to be in reply to any argument advanced by defense counsel. The portions referring to the amount of time spent on the case apparently were in answer to some statement of the defendant, but the remarks ''I have stood in this courtroom—and I will do it again whenever the occasion arises—and tell you ladies and gentlemen of the jury that I don't think you should con-

vict the man; I don't think he is guilty—when I don't think he is—and I have done just that right here," were not answering the defendant, but stating in effect that in the opinion of the district attorney the defendant is guilty. ". . . and I have done just that right here" and "I am deadly, absolutely certain, and there is not a scintilla of doubt in my mind" can only mean with reference to this particular case and defendant. They are not statements of a general attitude of the district attorney as to prosecutions, but are directed to this particular prosecution and defendant alone, and certainly no argument of defendant could justify a prosecuting officer in stating "any time I am not absolutely convinced of the guilt of a defendant brought into this courtroom here, *I pledge you my word of honor,* I will tell the jury about it." (Emphasis added.)

We have in mind the rule set forth in a number of cases, including *People* v. *Chilcott, supra* (18 Cal.App.2d 583, at page 586): "When that portion of the address in which the criticised language occurs is examined it becomes apparent that the speaker was replying to a charge or an insinuation made by appellant's counsel in their arguments to the jury that the district attorney, during the course of the trial, had sought to procure a change in the testimony of a certain witness called by the prosecution because the testimony as originally given did not fit with certain documentary evidence consisting of a written report by a ballistic expert, which evidence was likewise submitted by the prosecution. The transcript on appeal, although it apparently contains the full text of the addresses made to the jury by counsel representing the respondent, contains no part of the arguments which were addressed to the jury by appellant's counsel. Under these circumstances a reviewing court is unable intelligently to appraise the effect of the criticised remarks and to declare that the language amounts to such prejudicial misconduct as to demand reversal of the judgment. (*People* v. *Bragdon,* 103 Cal.App. 20 [283 P. 881]; *People* v. *James,* 133 Cal.App. 751 [24 P.2d 859]; *People* v. *Lawyer,* 1 Cal.App.2d 1 [35 P.2d 1036]; *People* v. *Gregory,* 12 Cal.App.2d 7 [54 P.2d 770]; *People* v. *Mareck,* 17 Cal.App.2d 278 [61 P.2d 972].) If appellant's counsel desired that the criticised language should receive the full consideration and fair appraisal of a reviewing court they should have complied with the provisions of section 7 of rule II of the rules of this court."

■ However, those cases were decided prior to the adoption in 1943 of the new Rules on Appeal. Rule 52 provides: "If a record on appeal does not contain all of the papers, records and oral proceedings, but is certified by the judge or the clerk, or stipulated to by the parties, in accordance with these rules, *it shall be presumed in the absence of proceedings for augmentation that it includes all matters material to a determination of the points on appeal.*" (Emphasis added.) Under that rule we must presume that had there been any statements made by defense counsel inviting the prejudicial reply, respondent would have had them included in the record. There can be no doubt that this rule applies to appeals in criminal cases. (17 S.C.L.R. 79, at p. 123 n. 128.)

Also we must assume that defense counsel did not make any statement in his argument that would justify the district attorney stating that on his word of honor he would tell the jury "any time I am not absolutely convinced of the guilt of a defendant." It is true that after this was assigned as misconduct the district attorney said, "I was very careful not to have phrased it in that manner. I was speaking in generalities." The first part of this remark indicates that the district attorney was purposely getting as close to the line as he could, and certainly his statement that he was "speaking in generalities" could not cure a remark which shows on its face he was referring definitely to the defendant. Especially is this true when he shortly theretofore said with reference to prosecuting only the guilty, "and I have done just that right here." As said in *People* v. *Edgar*, 34 Cal.App. 459, at page 468 [167 P. 891] : "When the district attorney declared that he would not prosecute any man he did not believe to be guilty he thereby wrongfully placed his personal opinion of the guilt of the defendant in evidence in the case. He was privileged to argue to the jury that it was his opinion formed from deductions made from the evidence adduced at the trial that the defendant was guilty of the crime charged (*People* v. *Rogers*, 163 Cal. 476 [126 P. 143]) ; but his declaration to the jury that he would not prosecute any man whom he did not believe to be guilty was tantamount to an assertion that he believed in the guilt of the defendant at the very inception of the prosecution ; and necessarily such belief must have been founded upon the result of the district attorney's original and independent investigation of the charge, and therefore in all likelihood was based, in part at least, upon facts which did

not appear and which perhaps could not have been shown in evidence.''

The last portion of that opinion is particularly appropriate here, as the district attorney here said: ''I know every in, out, quirk, and little incidental about this defendant, and about every witness who appeared on this stand. I spent hours down in that neighborhood; I spent time at the school questioning the teachers; I spent time on records, *marriage certificates*, correspondence. No, I *am deadly, absolutely certain, and there is not a scintilla of doubt in my mind.*'' (Emphasis added.) The natural conclusion of a jury from this sentence would be that the district attorney's certainty was based not alone upon the evidence, but upon his hours spent down in the neighborhood, etc.

■ Respondent contends that this court cannot consider the first alleged prejudicial statement for the reason that no objection was made to it at the time it was made. The general rule is that it is the defendant's duty, if he thinks any statement made by the district attorney is improper, to make known his objection at the time it is made, and having failed to do so, it is too late to raise the objection for the first time on appeal. (*People* v. *Chilcott, supra* [18 Cal.App.2d 583] ; *People* v. *Tedesco,* 1 Cal.2d 211 [34 P.2d 467].) But there is an exception to this rule. As stated in *People* v. *Podwys,* 6 Cal. App.2d 71, at page 76 [44 P.2d 377] : ''The general rule is that any objectionable remarks or argument of the district attorney must be objected to at the time they are made, and the court requested to admonish the jury concerning them, before they can be made a ground for appeal. However, in the case of *People* v. *Stafford,* 108 Cal.App. 26 [290 P. 920], this court after stating the general rule, approved the exception stated in *People* v. *Simon,* 80 Cal.App. 675, 679 [252 P. 758], as follows: 'There is, however, a well recognized exception to this general rule, and the exception is simply this: Where an examination of the entire record fairly shows that the acts complained of are of such a character as to have produced an effect which, as a reasonable probability, could not have been obviated by any instructions to the jury, then the absence of such assignment and request will not preclude the defendant from raising the point in this court.' ''

■ This, then, brings us to the question of whether the first statement of the district attorney was of such a character as to have produced an effect which, as a reasonable proba-

bility, could not have been obviated by any instruction of the court. Of a similar nature, too, is the inquiry concerning the second statement to the jury, and to which the defendant did object, and as to which the court very moderately admonished the jury. Could any admonition as to the first statement and the admonition given as to the second statement obviate their effects, and if not, were the remarks so prejudicial as not to be cured by section 4½ of article VI of the Constitution? As stated in *People* v. *Simon*, 80 Cal.App. 675, at page 679 [252 P. 758] : "The question, however, that we are called upon to determine is whether from an examination of the entire record, including the evidence, we can say that the misconduct of the district attorney was of such a character that the harmful result therefrom could probably have been entirely obliterated from the minds of the jury if an opportunity had been given the trial judge and he had made timely and proper instructions to the jury. If this were reasonably possible, then the defendant cannot remain silent and take the chance of a favorable verdict and, losing, urge as grounds for a reversal an error which, but for his silence, might have been entirely corrected. If, however, where it fairly appears, as we think it does in the case at bar, all of the record, including the evidence, considered, that the remarks of the district attorney were a factor in influencing the jury in arriving at their verdict of guilty, such result is a miscarriage of justice and the judgment and order should be reversed."

To answer those questions, it is necessary to consider the background of the case as disclosed by the evidence. We have heretofore set forth the evidence in some detail. There was no direct corroboration of the testimony of the prosecutrix, other than that the school principal corroborated the fact that the prosecutrix left school about 2 p. m. on the day the crime is charged to have been committed, and did not return that day; also that the prosecutrix had received a telephone call shortly after 12, and that she told the principal that she had received such a call and had to go down town to meet someone. Of course, in the types of crimes with which the defendant was charged, the law does not require corroboration. The testimony of the prosecutrix alone, if believed, is sufficient to convict. There was indirect corroboration in the following particulars, which are mostly important because the defendant denied they occurred: The school principal testified that she saw defendant circling the school about noon on April 12th

(the day Johanna claimed that defendant had phoned her and asked her to meet him). This the defendant denied. Mrs. Merrifield testified that she saw defendant around his home at the noon hour on several occasions between March 31st and April 17th. (She does not definitely place him there on the significant day, April 3d.) Defendant denied being around home at the noon hour on any of these days. Mrs. Merrifield's testimony is somewhat weakened by her bias against the Filipinos. Mrs. Lela Silva also testified in direct contradiction of defendant, that she had seen defendant around his home at noon many times in the first week of April. She could not give any exact date, nor did she definitely say that she saw defendant there on April 3d. She did not "particularly" resent Filipinos living near her property, nor does she "like or dislike" them.

While the evidence was sufficient for the jury to convict (even the testimony of the prosecutrix, as pointed out before, if believed, was sufficient in itself for that purpose), it was not a case so strong that a verdict for the defendant would have been unreasonable. The defendant's alibi (although disbelieved by the jury) was of importance. The prosecutrix admittedly had been in the hotel before so that her description of its interior could not be considered as corroboration. Primarily, it was a case of a white girl against a Filipino. Moreover, the district attorney constantly kept before the jury the fact that the defendant for some time had been living in a meretricious relationship with a white girl, whom he married shortly after his arrest. Over objection, he brought this matter to the attention of the jury three times in the cross-examination of Mrs. Hidalgo and once in the examination of Hidalgo. (He was evidently referring to this in his statement that he had spent hours in the neighborhood, and time on records and "marriage certificates.") In addition, he emphasized that relationship in both opening and closing arguments, laying great stress upon the fact of a white woman living in a home with a Filipino to whom she was not married, with other Filipinos likewise living in the house.

True, there were the constant bickerings, the heckling, the barbed wise-cracks, the constant interruptions by one counsel of the other, and from beginning to end a course of conduct about equally participated in by both sides, which should not occur in any courtroom. The defense attorney was constantly needling the district attorney and the latter was constantly

needling the former. Respondent contends that this situation was such that the jury would not pay much attention to anything he might say which the court admonished the jury to disregard.

Respondent urges that the language in *People* v. *Gordon*, 78 Cal.App. 167, at page 172 [248 P. 289], "the defendant is precluded from urging any objection to the conduct of the district attorney . . . in so far as it coincides with the example . . . set by counsel for the defendant," is applicable here. He calls attention to such actions of the defense attorney as when the district attorney said he could not understand one of the questions asked prosecutrix by defendant, defense counsel stated, ". . . maybe this child can understand things you can't"; that he claimed the district attorney "was bragging"; a reference to "the fine Italian hand of Mr. Mullins in this thing," and when Mr. Mullins replied, "Irish hand," defendant's counsel stated: "That Irish hand is big and clumsy"; the suggestion that the district attorney went to liquor establishments after midnight; that he would "straighten out a witness" before giving testimony; stating that the district attorney was "playing smarty-pants" when he said of one of defendant's objections that it was "the most frivolous objection I ever heard"; that the district attorney was stupid; that "I wouldn't like to take the skeletons out of the District Attorney's office," and other instances of indelicacy, poor taste and unfair tactics on behalf of the defense attorney. All these instances were during the trial and before argument. However, the record shows that the district attorney gave tit for tat. For example, in reply to the statement about "skeletons," the district attorney said, referring to the fact that the defense attorney had formerly been a member of the district attorney's staff, "You spent a lot of time with them there." The reference to "stupid" came after the district attorney had said, "You are known as the nine weeks lawyer" to which the defense counsel replied, "That is because I had a stupid district attorney." The defense attorney said of himself, "I think I can submit my objections in my own stupid way." Several times the district attorney stated in effect that defendant wanted to drag the case out for nine weeks. The district attorney later, when charged with anticipating a question, said, "I am a mentor." The reference to the district attorney going to liquor establishments after midnight came when defense counsel asked prosecutrix if she did

not know that whiskey could not be bought in any store in San Francisco after midnight. Thereupon the district attorney said, "Oh, Counsel, you haven't been around." The district attorney constantly accused defense counsel of "making a speech" to the jury when he objected or attempted to explain his position to the court. The district attorney said to defense counsel, "It is hard enough for you to think, period." Defense counsel referred to the alleged prejudice of the neighbors, and intimated that it would show when they testified, and then said: "This is America, thank God." The district attorney said, "And not the Philippine Islands." Further tactics: "Mr. Mullins: Completely untrue, and simply injected for the purpose of getting something before this jury indirectly that he could not get in directly. Mr. Gillen: If it is completely untrue, why don't you let me go ahead and make a fool out of myself. Mr. Mullins: I don't have to let you go very far. Mr. Gillen: I have been practicing ever since you were rolling hoops. Mr. Mullins: I have been practicing quite a while, too, and was away for four years. Mr. Gillen: Glad you're back!" These are only a few of the many unnecessary interchanges between counsel. It got so bad that the court at the end of one of counsel's verbal jousts said: "Ladies and Gentlemen of the jury, isn't this most interesting? I have never had this experience before jurors. One of the Jurors: Give them a pair of boxing gloves. The Court: I think the next time we will just retire and let you have a match."

While the conduct of the defense attorney in the trial of the case was more reprehensible than that of the district attorney, nothing occurred which would justify the district attorney stating in his argument the matters hereinbefore set forth. Moreover, it must be borne in mind that while the district attorney and the defense attorney were probably enjoying themselves hugely, the defendant is the one who suffered the effects of the action of the district attorney. He is the one whose conviction could very well have been brought about, under the circumstances of this case, by the district attorney's misconduct.

As said in *People* v. *Podwys, supra* (6 Cal.App.2d 71, at page 74): "Whether or not misconduct of a district attorney is cause for reversal rests largely upon the facts in each case." There are a number of recent cases in which the court refused to reverse the judgment upon the grounds that the misconduct

under the facts was not prejudicial. In *People* v. *Gordon, supra* (78 Cal.App. 167) the alleged misconduct appeared minor and the court held that defendant's counsel expressly waived any objection to it. In *People* v. *Chilcott, supra* (18 Cal.App.2d 583), there were statements made similar to those made in our case, which the court held were misconduct. However, the court felt that the failure to object to these, and the fact that the issue of the defendant's guilt or innocence was not close, caused the misconduct to be not prejudicial. In *People* v. *Harden,* 14 Cal.App.2d 489 [58 P.2d 675], the court held that the claims of misconduct on the part of the district attorney were entirely without merit, trivial in nature, and adequately cured by the instructions of the court. In *People* v. *Gray,* 52 Cal.App.2d 620 [127 P.2d 72], the alleged misconduct was held to be not "flagrant or any violation of his [defendant's] rights." In *People* v. *Summar,* 26 Cal.App.2d 439 [79 P.2d 389], the district attorney in his opening argument stated that the defendant was not "an ordinary crook." The defendant objected, not on the ground of misconduct, but "because there is no evidence on which that inference might be drawn." The court did instruct the jury to disregard the district attorney's statement. Another assignment of misconduct was not considered for the reason that there had been no objection made, and "The remark was not of such character that prejudice from it must be presumed." In *People* v. *Seeley,* 75 Cal.App.2d 525 [171 P.2d 529], the alleged misconduct of the district attorney was disregarded by the court because the evidence against the appellant was "almost conclusive" and the remarks made were in response to similar arguments made by the defense counsel. In *People* v. *Reed,* 27 Cal.App.2d 484 [81 P.2d 162], the remarks were held to be not seriously prejudicial, as well as the fact that no objection was made to them. In *People* v. *Wagner,* 62 Cal.App.2d 597 [145 P.2d 646], the alleged misconduct is not set forth, but the court states, "Without saying that either was unjustified or prejudicial, it is sufficient to state that the question is not properly raised here as appellant did not object. . . ." In *People* v. *Tedesco, supra* (1 Cal.2d 211), the court found that the remarks of the district attorney which the defendant claimed to be misconduct "cannot, in our estimation, be interpreted as the appellant contends." In *People* v. *Black,* 45 Cal.App.2d 87 [113 P.2d 746], the court found that many of the matters assigned as error were not objected to and that while in a few instances in the argument the prosecutor did

depart from the record and in so doing exceeded the bounds of propriety, the trial court on numerous occasions admonished the jury to disregard such matters, and as the appellate court was satisfied of the guilt of defendants it was convinced that "such improprieties as may have existed did not result in a miscarriage of justice."

In the following cases the court found that the misconduct was serious enough to be prejudicial. In *People* v. *Podwys, supra* (6 Cal.App.2d 71), the district attorney as in this case went on to assure the jury that he would not prosecute any man who was not guilty. The court held that there could be no excuse for such comment; it was satisfied that this misconduct weighed heavily against the defendant and may have brought about his conviction. The decision in the Podwys case was based upon the decision in the case of *People* v. *Edgar, supra* (34 Cal.App. 459), where the district attorney likewise stated that he would not prosecute any man that he did not believe to be guilty, and that type of conduct was held to be highly prejudicial. In *People* v. *Braun,* 14 Cal.2d 1 [92 P.2d 402], the intimation and questions by the district attorney that the defendant, who himself was an ex-convict, consorted with ex-convicts, was held to be prejudicial misconduct, which might have been the deciding factor which had brought about his conviction. The conviction was set aside in *People* v. *Simon, supra* (80 Cal.App. 675). The statements of the district attorney there were more flagrantly violative of the rights of the defendant than in our case. However, such was only a matter of degree. The defendant failed to except to the remarks, and the court held that they were of such a type that any admonition by the court could not cure.

In a comparison of the cases in which the court found the misconduct to be prejudicial with those in which the court found otherwise, it appears that the test of whether the court is going to apply the rule that the alleged misconduct must be objected to in the lower court depends on the type of misconduct of the district attorney; on whether or not the case is close, and on whether the misconduct is of a type which in view of the closeness of the case an admonition of the trial court would or would not cure; and where objection is made and an admonition given, the effect of the misconduct. It depends somewhat upon the type of admonition given by the court. In this case, the court's admonition to the very prejudicial remarks of the district attorney was not very strong, and not particularly calculated to impress the jury with the serious-

ness of the district attorney's conduct. The court merely said: "I admonish the jury to disregard that statement of counsel's relative to cases in which· if he is not convinced; you will disregard it. I grant that that far." Apparently what the court meant by "I grant that that far" was that it was not granting a motion for a mistrial. However, that very expression seems to weaken the admonition, and at best, the court's remarks were very mild concerning a most grievous situation.

We have examined the entire record, including the evidence, to determine if there were a "miscarriage of justice" within the meaning of section 4½ of article VI of the Constitution. As said before, the evidence sustains the finding of the jury. However, while there was strong evidence that the defendant was around his home and Johanna's school during the noon hour in the early part of April, a fact denied by defendant and claimed impossible by his witnesses Ben Unruh and Mrs. Rosalie Hugo, justifying the inference that defendant did meet Johanna the day in question—whether they actually met and had sexual intercourse depends entirely upon Johanna's testimony—a white girl's word against that of a Filipino. It cannot be said that the evidence against defendant was such that the jury would not have been justified in finding a verdict in favor of the defendant. Moreover, had there been a verdict in his favor, it would have been supported by the evidence of himself and his alibi witnesses. Again using the language of the Podwys case (6 Cal.App.2d 71, 75): ". . . the defendant offered by evidence of apparent reliability, an alibi. . . ." We are convinced that the misconduct of the district attorney in this case weighed heavily against the defendant and may have brought about his conviction. The error has, therefore, resulted in a miscarriage of justice, entitling the defendant to a new trial.

The judgment and order appealed from are reversed; and the cause is remanded for a new trial.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied April 23, 1947, and respondent's petition for a hearing by the Supreme Court was denied May 8, 1947.