[Crim. No. 3071. First Dist., Div. One. Oct. 13, 1955.]

THE PEOPLE, Respondent, v. MANUEL TEIXEIRA, Appellant.

Frances Newell Carr for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

PETERS, P. J.—Manuel Teixeira and Louie Parks were jointly indicted for the murder of Fred Jimenez. After a lengthy trial, the jury exonerated Parks and found Teixeira guilty, fixing the degree as second degree murder. From the judgment entered on this verdict, and from the order denying his motion for a new trial, Teixeira appeals.

The facts, as disclosed by the record, can be summarized as follows:

In October of 1953 appellant was a part owner of the Flame, a bar located on Jones Street in San Francisco. At that time Parks and appellant had known each other for some time. In 1953 appellant offered to sell to Parks a share in the Flame. Parks was interested, and in order to familiarize himself with the business, worked at the Flame for some two months prior to October 21, 1953.

Jimenez, the deceased, was a friend of some three years' standing of appellant, and was closely associated with appellant during the two or three months prior to October 21, 1953. During this period Jimenez had no regular employment but did odd jobs around the Flame in return for free meals and some small remuneration. Appellant testified that he considered Jimenez a good friend and that he trusted him, even to the extent of permitting him, on occasion, to close the bar.

Both of the defendants testified that for some three weeks prior to October 21, 1953, they ascertained that shortages of from five to ten dollars existed in the money in the cash register, and appellant testified that several days prior to that date $300 was taken from the office in back of the bar. Because of this discovery, he testified, he had the locks on the office doors changed.

At about 3 o'clock on the afternoon of October 21, 1953, a prosecution witness, Mrs. O'Neil, a customer of the Flame who knew appellant and also Jimenez, saw the latter in the Flame change a $50 bill. Another prosecution witness, Crouch by name, the proprietor of a night club in San Francisco, testified that about 7 p. m. Jimenez came to the night club dressed in a sport outfit and clean shaven, and watched a prize fight on television. Jimenez at that time purchased a round of drinks for Crouch and several of his employees, and during the evening, and prior to 8:15 p. m., when Jimenez left the club, he purchased four or five rounds of drinks. Crouch noted that Jimenez had a substantial sum of money, at least ten $100 bills. According to Mrs. O'Neil, Jimenez

arrived back at the Flame at about 8:30 p. m. and bought drinks for her and several other persons. The witness then left the Flame and did not return until about 1:15 a. m. of October 22, 1953.

The record next shows that about 1 a. m. Parks and Jimenez met near the Flame and went into a nearby bar and had several drinks. Parks testified that Jimenez did not pay for these drinks, that Jimenez left shortly after 1:15 a. m., and that he, Parks, left about 1:45 a. m.

Mrs. O'Neil testified that she arrived back at the Flame at about 1:15 a. m. Appellant, who was tending bar, left the bar and went into a back room. Upon his return he talked to the witness. In a few minutes appellant again went into the back room, and in a few minutes returned to the bar looking upset and stated: "Excuse me, people, I am having a little trouble in the back room. I am not ordinarily like this." At about 1:45 a. m. Mrs. O'Neil went to the back room to make a telephone call. From the phone booth she could see part of the storeroom of the establishment. She saw Jimenez sitting in a chair with his head slumped on his chest. The portion of his body that she could see, from the waist up, was unclothed. When she returned to the bar, a bartender went into the back room with appellant, the bartender returned to the bar, and shortly thereafter appellant returned and stated that he had caught Jimenez stealing.

At about 2 a. m. appellant asked the bartender to close the bar. This was done, leaving the bartender, appellant, Mrs. O'Neil, Jimenez and Parks (who had returned to the Flame) in the bar. Mrs. O'Neil testified that she first saw Parks that night shortly after 2 a. m. when he came out to the bar from the back room to get some ice to make an ice pack. Thereafter, she testified, Parks and appellant made several trips to and from the back room. Between 2 and 3 a. m. Parks and appellant had several conversations in the presence of the witness in which they stated that they had caught Jimenez stealing and had had to hit him to get him to disclose where the money was hidden. At about 3 a. m. the bartender and appellant carried Jimenez out of the back room into the bar. Jimenez was unconscious and his face was swollen. Appellant's right hand was also swollen. The witness then testified that appellant left, stating that he was going to call a cab, but returned in a few moments, stating that there was a police officer outside. Appellant then phoned for a cab. Shortly thereafter, according to this witness, a

cab driver did appear and appellant gave him $10, telling him to take Jimenez to a hospital and to tell the hospital that he, the cab driver, had picked Jimenez up on the street. The bartender and appellant carried Jimenez out and put him in the cab, and the driver left. Thereafter, Mrs. O'Neil, Parks and appellant went to the latter's apartment. Mrs. O'Neil testified that both Parks and appellant then complained that their hands hurt, stating that they had had to hit Jimenez hard, and that they could not understand how Jimenez could have done such a thing as to steal money from them. Appellant told the witness that when he asked Jimenez for the stolen money Jimenez had struck him and a fight ensued; that his stomach still hurt; that Jimenez claimed that he had not taken the money and had voluntarily stripped to prove it. Mrs. O'Neil also testified that both Parks and appellant told her that Jimenez had finally pointed to the stove in the storeroom as the hiding place of the money; that when appellant went to look into the stove Jimenez picked up a bottle and tried to hit appellant; that appellant charged at Jimenez, and the latter fell backwards and hit his head on a case of beer which was on the floor; that both defendants told her that they then observed $20 bills ''coming out of the beer case'' where the bottle had been removed. She also testified that the next day at the Flame she heard conversation to the effect that appellant had also kicked Jimenez.

At the close of her direct examination Mrs. O'Neil testified, in response to the direct question, that this was all of the conversation that she had had with the defendants in the apartment, but on cross-examination she remembered several other things that appellant had said. She testified that appellant had stated that Jimenez had come into the bar and asked appellant for the keys to appellant's apartment so that he could shave; that appellant said he gave Jimenez the keys and then Jimenez went into the back room, stating that he had to get some shaving gear; that when Jimenez did not return appellant went to look for him and found Jimenez coming out of the office; that Jimenez failed to reply to the question as to what he was doing in the office; that appellant told the witness he could hardly believe that Jimenez would steal from him because they were such good friends and appellant had been feeding him; that when he accused Jimenez, the latter struck him in the stomach and a fight ensued.

On redirect the prosecution claimed surprise and was allowed to try and impeach the witness by asking her if she

had ever told the deputy district attorney or the inspector of police about appellant's statements that Jimenez had struck him in the stomach first, that Jimenez had fallen backward against a box, or that appellant had given Jimenez the keys to his apartment. The witness replied that she believed she had told those things to the police.

A taxi driver testified that at about 3:40 a. m. he received a radio call to pick up a fare at the Flame Club; that when he arrived appellant told him Jimenez had been beaten up, having been caught stealing money, and asked the driver to remove him. The cab driver refused, but told appellant that he would get him another cab, one that could not be traced, in order to protect appellant.

Another cab driver testified that the first one told him about the fare at the Flame Club, and that when he arrived there Jimenez was unconscious. Appellant told him Jimenez had been drinking and had been in a fight, and later appellant told him Jimenez had been caught stealing $300 and appellant had "slapped" him around a bit; that appellant then offered the driver $10 to take Jimenez to the emergency hospital and to "forget where you got him"; that he drove the unconscious man to the hospital; that there he and the hospital steward examined Jimenez's wallet and there was no money in it.

Inspector Cahill testified that he went to the hospital on October 22, 1953, to see Jimenez, and observed numerous cuts and abrasions; that Jimenez was unconscious, appeared clean shaven and was breathing heavily; that on October 25th he interviewed Parks. His testimony as to what Parks then told him is substantially the same as the testimony given by Mrs. O'Neil, with the exception that Parks had stated that a Walter Kolinsky was present during the fight; that Jimenez had gone over to the stove and pulled some money out of the stove; that appellant believed more money was missing and continued to beat Jimenez to compel him to disclose the hiding place; that appellant found a $50 and a $20 bill in a box, but continued to beat Jimenez, stating that at least three $20 bills were still missing; that at the end of the beating Jimenez fell to the floor. Cahill also testified that while Parks told him that he did not see appellant kick Jimenez, he had heard some conversation in the bar to that effect. Cahill also testified that when he talked to appellant and Kolinsky he was told by appellant that Kolinsky was not there that night. Kolinsky told the officer that he had

been asked to tell a false story by appellant, but appellant denied this. Cahill found shaving cream in the storeroom, but no razor.

Police Officer Towle testified that on October 27th appellant told him that he had used no weapon in hitting Jimenez, only his hands, and that Jimenez had not hit his head when he fell.

Defendant Parks testified that he arrived at the Flame about 1:30 a. m., October 22, 1953; that appellant told him he had a thief in the back room whom he had discovered stealing money; that Parks agreed to and did tend bar while appellant went into the back room; that when the bar was closed he went back into the storeroom and there found appellant and Jimenez; that Jimenez had a bloody nose and a black eye, and was sitting on the floor naked; that Jimenez asked Parks to help him and stated that if appellant would not call the police he would tell where the money was hidden, and then pointed to the stove; that when appellant turned towards the stove Jimenez grabbed a bottle and attempted to hit appellant; that Parks yelled a warning; that appellant turned around and started to fight with Jimenez; that during the fighting Jimenez fell backward against some cases and did not get up. Parks denied that at any time he had struck Jimenez.

Appellant also took the stand. He testified that about 1 a. m. of October 22, 1953, Jimenez had come to the Flame and asked appellant for the keys to appellant's apartment so that he, Jimenez, could shave; that he gave Jimenez the keys and Jimenez went into the back room, stating that he wanted to get his shaving gear; that in about 3 or 4 minutes, when Jimenez did not return, he went into the back room and found Jimenez coming out of the office; that he, the appellant, had had the lock changed on the office door a couple of days before because he had discovered $300 missing from the office; that he asked Jimenez what he was doing in the office and when he received no reply went into the office and discovered more money was missing; that he accused Jimenez of taking the money, and Jimenez denied it; that he started to search Jimenez when Jimenez hit him in the stomach; that a fight ensued, and Jimenez fell down; that appellant ordered him to strip and Jimenez did so; that there was no money in his clothing; that he told Jimenez to sit there and he, appellant, made several trips back to the bar and then back to the storeroom; that each time Jimenez

denied taking the money; that he told Jimenez he did not want to report the theft to the police because of the friendship between the two; that Jimenez continued in his denials; that then Parks came and took over the bar; that Parks later came into the back room and talked to Jimenez; that Jimenez finally pointed to the stove as the hiding place of the money; that when he, the appellant, turned to go to the stove Jimenez grabbed a bottle and tried to slug him; that appellant turned and charged at Jimenez; that there was a scuffle and Jimenez fell backwards and hit his head on a case of mix.

Jimenez died in the hospital, without regaining consciousness, on October 25, 1953. The autopsy surgeon testified that death was caused from concussion of the brain and traumatic intercranial hemorrhages, that is, brain injury due to external violence. There were numerous abrasions, lacerations, and other injuries, particularly to the ribs. A bruise on the left hip could have been caused by a kick, and the marks on the face by a human fist. One doctor estimated that at least 12 blows from a fist would be required to cause the injuries he observed; that while some of the injuries could have been caused by a fall, their entire pattern was such that they probably were not caused by a fall; that there was a separation in the left parietal and temporal portions of the skull, known as the suture line, caused by injury; that such an injury requires considerable force; that it could have been caused by a kick.

Another doctor confirmed the autopsy surgeon's findings, and testified that the injuries could not have resulted from a single localized blow, but were caused by a number of blows. He further was of the opinion that if it were assumed that the injuries were caused by a human fist at least five blows were required.

A defense doctor differed with the findings of the prosecution doctors in several respects. He was of the opinion that the suture line was probably an old injury; that many of the injuries could have been caused by a fall; that several of the bruises apparent after death could have been caused by intravenous feeding or blood transfusions given at the hospital; and that the injuries to the brain could have been caused without external violence.

On this evidence, the jury exonerated Parks and found appellant guilty of second degree murder. Appellant attacks the judgment in several respects. A major contention is that the prosecutor was guilty of prejudicial misconduct.

First, it is contended that the prosecution improperly told the jury that appellant had offered to plead guilty to manslaughter. This occurred under the following circumstances: Mrs. O'Neil was being cross-examined by appellant's counsel. He asked the witness: "All right, and didn't Mr. Berman [the deputy district attorney] state to you that 'If that pipsqueak is smart, he'll take a plea of guilty to manslaughter,' do you recall telling me that?" After a prosecution objection had been sustained, appellant's counsel repeated the question in the following manner: "Well then, let me put it this way: Didn't you say to me that Mr. Berman told you, 'If that pipsqueak is smart, he'll take a plea to manslaughter,' and I said to you, 'I won't plead to anything. These men are innocent.' Didn't that take place?" The deputy district attorney then stated: "Just a minute, I will object to that on the grounds—as a matter of fact, I am not going to object, your Honor." Then the following occurred:

Appellant's counsel: "No, you better not."

Deputy district attorney: "No, because you offered to plead them guilty to manslaughter and I wouldn't take it. That happened right here."

Counsel for Parks: "That is a lie."

The Court: "Just a minute."

Counsel for appellant: "Wait a minute, if there is going to be a fight, let me handle it."

The Court: "Just a minute, gentlemen, I am up here."

Counsel for appellant: "I will remember it, your Honor."

The Court: "Mr. Berman says he has no objection to your questions, so——"

Counsel for Parks: "Your Honor, I am going to cite the District Attorney for misconduct."

Counsel for appellant: "I wouldn't even plead you guilty to manslaughter."

Deputy district attorney: "Did you or didn't you offer to plead guilty in those Chambers two days ago?"

Counsel for appellant: "I didn't do anything of the kind."

The Court: "Just a minute."

Deputy district attorney: "Did you or didn't you? . . ."

The Court: "All right, all right, you asked a question, Mr. Berman has no objection, so your question will be allowed to remain in the record. Mr. Berman's remarks made after your objection will be stricken, and the jury is instructed to disregard it as well as Mr. Wainwright's [attorney for Parks] statements. . . ."

Deputy district attorney: "We will object then, if your Honor please."

The Court: "Are you objecting now?"

Attorney for appellant: "You are objecting now? . . ."

(The question was reread.)

Deputy district attorney: "To which we object, if your Honor please, incompetent, irrelevant and immaterial."

The Court: "The objection is sustained. The jury is cautioned and admonished to disregard any of these ·statements. The ultimate decision of what this case is about, what are the facts, will be for the jury, under the Court's instructions."

■ There can be no doubt that during this exchange the deputy district attorney got before the jury two main thoughts: One, that he personally believed the defendants were guilty of murder because, so he said, he refused to entertain a manslaughter plea as a compromise; and two, that defendants had offered to plead guilty to manslaughter. There·can be no doubt that it is error to bring such matters before the jury, and that in some circumstances even an admonishment by the trial court cannot prevent such error from being prejudical. (*People* v. *Hidalgo*, 78 Cal.App.2d 926 [179 P.2d 102]; *People* v. *Chilcott*, 18 Cal.App.2d 583 [64 P.2d 450]; *People* v. *Podwys*, 6 Cal.App.2d 71 [44 P.2d 377]; *People* v. *Edgar*, 34 Cal.App. 459 [167 P. 891].) Of course, we must keep in mind, in determining whether the error was prejudicial, that appellant's counsel first opened up the general subject by his cross-examination of Mrs. O'Neil. In some circumstances this prevents the misconduct from being prejudicial. (*People* v. *Rinesmith*, 40 Cal.App.2d 786 [105 P.2d 1021]; *People* v. *Kennedy*, 21 Cal.App.2d 185 [69 P.2d 224].) But a trial is not a game. ■ Because appellant's counsel committed one impropriety the deputy district attorney was not necessarily entitled to match it. (*People* v. *Sampsell*, 34 Cal.2d 757 [214 P.2d 813]; *People* v. *Kirkes*, 39 Cal.2d 719 [249 P.2d 1].) In the instant case the prosecution could have objected to the question and the objection would have been sustained. In fact, the court twice properly sustained objections to the question. But the deputy district attorney, after once having secured an order sustaining the objection, withdrew his objection, made his speech about defendant's offering to plead guilty, and then, after the damage was done, again objected, and again the objection was sustained. Keeping in mind the serious effect the improper statement of the prose-

cutor to the effect that defendants had offered to plead guilty to manslaughter necessarily would have on appellant's case, it is very doubtful if the admonishment by the trial court could cure the error.

Other errors occurred. Two prosecution witnesses testified that a certain Jean Hinz had disappeared, and that, prior to her disappearance, the police had taken a statement from her. The defendants' counsel moved to strike, and because there was no showing that her disappearance was connected with defendants, the motion was granted, and the jury was admonished to disregard any testimony about Jean Hinz. But, in his closing argument to the jury, the deputy district attorney referred to the disappearance of Jean Hinz, told what she would have testified to, and averred that defendants were afraid of her evidence because of what she had told the police. The prosecutor went on to say that he had brought before the jury all available evidence and had not tried to conceal any evidence ''As a matter of fact, we showed just to the contrary; we were the ones who put on evidence to show hy [sic] Gene Hinds wasn't here. . . . We think, ladies and gentlemen of the jury, that a citizen not only has certain rights in America, but he has certain duties and obligations, and one of them is to conform to the law of the majority, not the law of the tenderloin, of the disappearance of witnesses, of the reluctant witnesses.''

■ This was an unwarranted, unproved charge of the suppression of evidence. This misconduct was aggravated by the prosecutor purporting to make statements of fact not appearing in the record. (*People* v. *Kirkes,* 39 Cal.2d 719 [249 P.2d 1].) There was not one word in the record as to what Jean Hinz would have testified to. While the appellant's counsel did not object to this portion of the argument, it is argued, with some merit, that this conduct was so prejudicial that no objection could have cured it. (See *People* v. *Kirkes,* 39 Cal.2d 719 [249 P.2d 1]; *People* v. *Hidalgo,* 78 Cal.App.2d 926 [179 P.2d 102]; *People* v. *Simon,* 80 Cal.App. 675 [252 P. 758]; *People* v. *Podwys,* 6 Cal.App.2d 71 [44 P.2d 377].)

Another claimed act of misconduct occurred during the cross-examination of appellant. ■ Twice the prosecutor asked appellant if the reason he did not call the police to report the claimed theft by Jimenez was that the Flame was in fact a front for a house of prostitution. Twice the objection was sustained, and the jury admonished. Nevertheless, the

prosecutor persisted and asked the question a third time and then had the reporter read it a fourth time. Again the objection was sustained. It is extremely doubtful whether the admonishment could overcome the implications involved in the question. (*People* v. *Douglas,* 83 Cal.App.2d 80 [187 P.2d 819].) The questions were clearly improper (*People* v. *King,* 23 Cal.App. 259 [137 P. 1076]) and it is hard to believe that this experienced prosecutor asked them in good faith and for any purpose other than to degrade defendants.

The deputy district attorney was also guilty of serious misconduct in another portion of his argument to the jury. After pointing out that the Flame was located in the tenderloin he stated:

"I looked up the word tenderloin, the definition of the word, and it just might [be] of academic interest. I found in Webster's dictionary that tenderloin was the area of night life, vice and corruption. . . .

"I think we should look behind that meaning in this particular case for several reasons. You have this area as a center of the underworld, you have your pimps and prostitutes and panderers, your ex-convicts and gamblers . . . and in this particular area we find the Flame, no better or worse than the other bars in the area.

". . . this group in our community take exception to the law and state that we are a law unto ourselves. We have our own code of ethics. We are the people who set the standards of conduct and that of course is what is commonly known as the law of the underworld."

Later in the argument the deputy district attorney used the following intemperate language:

"Parks is unemployed, driving a Cadillac. Are these men independently wealthy, or are they panderers? Ask yourselves why, ladies and gentlemen of the Jury, Mr. Ehrlich asked this question, why they objected to our pursuing the subject of Geinger May Harvel yesterday. Ask them why they objected to our pursuing the subject of Jean Hinz. Ask yourselves why they objected and screamed bloody murder when we said, 'Isn't it true that there had been a raid in Las Vegas and Geinger May Harvel, Mary Fegundes'—we mentioned the names—'do you think we are just talking out of a cocked hat?' They are the ones who screamed. Oh, they screamed like stuck and wounded eagles.

"Because, ladies and gentlemen of the Jury, from the type

of premises, from their wounded pride as they screamed here, you know very well what the Flame was a front for.

"I asked a question, it was sustained—the objection was sustained to it . . . gee, I wish I could get around the hearsay rule. I said, 'Isn't it true the Flame is a front for a house of prostitution, running prostitutes out of there?' I asked if Geinger May Harvel was running prostitutes out of there. There was an objection, and the Court in its wisdom sustained it.

"Now why should they object if they wouldn't want you to know it?

"Now these are not sweet, innocent boys——''

This argument was clearly improper. ■ While a prosecutor is entitled in his argument to make reasonable deductions from the evidence and to draw reasonable inferences from the testimony (*People* v. *Vaughn*, 25 Cal.App. 736 [147 P. 116, 117] ; *People* v. *Sieber*, 201 Cal. 341 [257 P. 64]), of course, he cannot state as facts matters that do not appear in the evidence. There is no evidence that either defendant was a pimp, or that the Flame was the front for a house of prostitution. It is obvious that these remarks must have been intended by the prosecutor to inflame the jury and to prejudice it against the defendants. While it is true that the defendants did not object, the misconduct was of such a flagrant character that an admonition would not have cured it.

The deputy district attorney also approached the line of prejudicial misconduct so far as appellant is concerned in cross-examining character witnesses for Parks by asking them if they had heard that both Parks and appellant had been arrested in Sacramento for beating a girl. Obviously, the questions were improper, so far as appellant is concerned. ■ The prosecution, of course, cannot, in the first instance, put into evidence the bad character of a defendant. (*People* v. *Adams*, 76 Cal.App. 178 [244 P. 106] ; *People* v. *Nunley*, 142 Cal. 441 [76 P. 45].) Another error occurred during the examination of Mrs. O'Neil. She testified at length concerning the conversations she had had with both defendants in the appellant's apartment on the morning of October 22d. At the close of her direct examination she stated that she had recounted all of the conversation she then had with the defendants. On cross-examination, however, she testified, in addition, that appellant had told her that Jimenez had asked for the keys to appellant's apartment so that he could shave. This conversation had not been mentioned on direct. On

redirect the prosecutor claimed surprise and damage and was allowed to try to impeach Mrs. O'Neil by trying to show prior inconsistent statements. This he did by asking the witness if she had ever told anyone connected with the prosecution about this conversation in reference to the keys. She replied that she thought she had, and that her failure to mention it on direct was inadvertent. But the deputy district attorney did not stop there. He proceeded to ask the witness whether she had ever told the officials that appellant had told her that Jimenez had struck the first blow by hitting appellant in the stomach, or that Jimenez had fallen and struck his head on a beer case. These were matters that the witness had testified to on direct examination. The deputy district attorney made no objection at that time. The witness stated that she thought she had told these things to the police officials. No attempt was made to produce her police statements to show that they were inconsistent with her testimony.

There can be no doubt that, if Mrs. O'Neil had not told the officials about the statements of appellant that Jimenez had struck the first blow, and about the fall, and first told this story on her direct examination, the prosecutor could legitimately have claimed surprise and damage at that time, and he could have then impeached her in a proper fashion. (*People* v. *Sliscovich*, 193 Cal. 544 [226 P. 611].) But as to these matters, there was nothing inconsistent in Mrs. O'Neil's testimony. On direct she told about this conversation. If the prosecution was surprised they were surprised when she testified on direct examination. But no surprise was then claimed. It was not until redirect that the prosecutor asked whether the witness had recounted these phases of the conversation to the officials. Read in context the broad implication of the questions was that the witness had fabricated this portion of her testimony after she had talked to the prosecuting officials. Yet the prosecution failed to lay any foundation for the claimed impeachment. There is no evidence at all as to what story Mrs. O'Neil told the investigating officers. No contradiction of the story told on direct examination was attempted. Yet in his argument to the jury the prosecutor referred to Mrs. O'Neil's testimony that Jimenez had struck the first blow and said "She came up with some additional information after she had given information to the Police on November 5th, and November 10th." When Parks' counsel objected that "There is no evidence of that," the deputy dis-

trict attorney claimed there was, and the court allowed the statement to stand.

■ Thus, while it perhaps would have been proper to permit the prosecuting attorney to impeach his own witness even on redirect examination of the witness, here the prosecution failed to lay any foundation for such impeachment, although broadly implying that her present testimony was different from that given the police. Then on final argument the prosecutor was permitted to assert that he had impeached the witness contrary to the fact. This was clearly error.

That the cumulative effect of these several errors was prejudicial is demonstrated by the verdict of the jury finding appellant guilty of second degree murder. Murder is, of course, the unlawful killing of a human being with malice aforethought. (Pen. Code, § 187.) ■ It is malice (which can be expressed or implied—Pen. Code, § 188) that distinguishes murder from manslaughter. ■ Normally, hitting a person with the hands or feet does not constitute murder in any degree. (*People* v. *Munn,* 65 Cal. 211 [3 P. 650]; *People* v. *Kelley,* 208 Cal. 387 [281 P. 609]; see annot. 22 A.L.R.2d 854.) But if death or great bodily harm is a reasonable or probable consequence of the beating the offense may be murder. (See anno. 24 A.L.R. 666.) ■ Thus, to constitute murder there has to be either an intent to kill or such wanton and brutal use of the hands without provocation as to indicate that they would cause death or serious bodily injury so as to indicate an abandoned and malignant heart.

In the instant case the theory of the prosecution was that the motive for the beating was to rob Jimenez of the money that the evidence shows he had earlier in the evening. But the jury must have rejected that part of the prosecution's case because if believed such evidence would have required a first degree murder verdict. Thus, so far as the evidence is concerned, this leaves as the only logical motive for the beating the story of defendants that appellant had caught Jimenez stealing. According to this testimony we have Jimenez going into the back room and being discovered by appellant coming out of the office, the discovery by appellant that money was missing from the office, the hiding of the money by Jimenez, and the brutal beating of Jimenez by appellant to compel disclosure of the hiding place. If this version is believed, and it is the only version supported by the evidence if the prosecution's theory is rejected, as apparently it was, appellant was

justified in using reasonable force to recover his money, the thief being apprehended under circumstances so as to constitute "hot pursuit." Thus, the only basis for the jury verdict of second degree murder is that the force used by appellant was so unreasonable and so wanton as to evidence an intent to inflict death or grievous bodily harm. The real issue in the case on the degree of the crime was whether malice was present. There is evidence in the case of the brutal nature of the beating inflicted that supports the inference of malice, but this issue was hotly disputed and is a very close one. This being so, it is more likely than not that the errors already discussed led the jury to imply malice where malice may not have existed. The improper discrediting of appellant, and the unwarranted attack on his character, could certainly lead to such a result. Certainly we cannot say that "a different verdict would not have been improbable had the error not occurred." (*People* v. *Putnam,* 20 Cal.2d 885, 892 [129 P.2d 367] ; see also *People* v. *Rogers,* 22 Cal.2d 787 [141 P.2d 722] ; *People* v. *Hamilton,* 33 Cal.2d 45 [198 P.2d 873] ; *People* v. *Newson,* 37 Cal.2d 34 [230 P.2d 618].) That being so, it must be held that the errors were prejudicial.

The judgment and order appealed from are reversed, and a new trial ordered.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied October 28, 1955, and respondent's petition for a hearing by the Supreme Court was denied November 9, 1955.