[No. B087812. Second Dist., Div. Seven. Feb. 13, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
LORENZO DAVIS, Defendant and Appellant.

**COUNSEL**

Thomas F. Coleman, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Susan D. Martynec and Raymund F. Robles, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.**—Lorenzo Davis appeals from the judgment entered following a jury trial resulting in his conviction of two counts of second degree robbery with the use of a firearm, and the court found he had two prior convictions of a serious felony and a prior felony conviction for which he had served a separate prison term. (Pen. Code, §§ 211, 12022.5, subd. (a), 667, subd. (a)(1), 667.5, subd. (b).) He contends: "I. The court abused its discretion, and committed reversible error by admitting gang evidence to

impeach appellant's alibi. [¶] II. The court's finding that the prior serious felony allegation for the aggravated assault was true is not supported by substantial evidence."

FACTS AND PROCEEDINGS BELOW

I. *Trial Evidence*

Viewing the evidence in the light most favorable to the judgment (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence established at 6:30 p.m. on Monday, November 15, 1993, James Sanders and Jitendrakumar Soni were working at Nate's Liquor Store. Two regular customers of the liquor store, "Chocolate" and "June Bug," entered the store and demanded the money from them at gunpoint. Chocolate and June Bug took $300 to $400 and fled. Sanders telephoned the police. Long Beach Police Officer Darryl Black arrived. Sanders told Black "Chocolate" and the Samoan named "June Bug" committed the robbery and described them. Soni gave Black the videotape from the store's videosurveillance system.

Sanders explained at the trial appellant was known as "Chocolate." Appellant frequented the liquor store as much as six times a day and was usually accompanied by "Ben," Byron "Jelly" Miller, a fellow with a parakeet on his shoulder, or "June Bug." Appellant was wearing the same clothing during the robbery as he had on earlier that day. Both Sanders and Soni said the robbers' identities were unmistakable despite the robbers' efforts to disguise themselves with red bandanna masks, eyewear and hats. Sanders and Soni also recognized appellant's semiautomatic pistol. It looked identical to the pistol appellant took from Benny "Ben" Ceasar the previous Friday for use during an altercation with another customer at the store.

At trial, the store's videotape was played to the jury while Sanders and Soni narrated the events of the robbery. The videotape showed appellant entering the store with his friend Ceasar at 3:30 p.m., 4:30 p.m. and 4:40 p.m. At 6:35 p.m., the videotape showed appellant and June Bug committing the robbery. At 4:30 p.m., 4:40 p.m. and 6:35 p.m., appellant was wearing the same black jacket.

The day following the robbery, on Lime Street, Sanders identified appellant as one of the robbers in a field identification procedure. On December 2, 1993, Soni identified appellant as one of the robbers when Officer Jerry

Garcia showed Soni a photographic display. Also, at trial, Sanders and Soni identified appellant as one of the robbers.[1]

In defense, Byron "Jelly" Miller and Miller's cousin, Ceasar, testified to an alibi for appellant. Around 5:30 p.m., Miller and Ceasar drove together with appellant to the cemetery at Cherry Avenue and Del Amo Boulevard to pay their respects to Miller's deceased brother. They left the cemetery at 6 p.m. Then, they went together to a Gardena bar, where they spent the rest of the night. Miller and Ceasar were 15-year friends of appellant. They all lived within several doors of one another on Lime Street.

During cross-examination Miller denied he told Garcia he was working for the city near the time of the robbery.[2] Miller testified his arms were tattooed with the words, "one" and "nine," which were tattoos identifying him as a member of the "19th Street Crips."

When the prosecutor commenced questioning Miller about his gang affiliation, defense counsel objected. Defense counsel urged the testimony was cumulative since the People had adequately established bias by showing Miller's long-term association with appellant. Defense counsel argued the gang-affiliation evidence was inadmissible during this trial since it was more prejudicial than probative. The prosecutor replied the loyalties the members of a gang have for one another went well beyond the bias arising from group association and provided an even greater motive for Miller to lie for appellant than if Miller and appellant were simply longtime friends. The prosecutor indicated he had an expert witness who would establish gang loyalties went beyond the usual group bias. The court ruled the gang affiliation would be admitted into evidence and deemed the defense objection a standing objection to any further evidence of gang affiliation.

During further cross-examination Miller denied the 19th Street Crips gang was also called the "Insane Gangster Crips" or the "Crip Gangsters." Miller acknowledged appellant was affiliated with him in the 19th Street Crips and had tattoos for the 19th Street Crips. Miller claimed his gang involvement

---

[1]Sanders denied there was animosity between him and appellant. Sanders acknowledged he had an earlier physical altercation with Ceasar. Appellant was present. Sanders no longer worked at the store since, after appellant's arrest, 10 of appellant's friends came to the liquor store to "get [him]."

Garcia admitted he inadvertently included within the photographic display two photographs of appellant. Soni selected only the most recent photograph of appellant.

[2]Later, in rebuttal, Miller was impeached with a tape recording of his earlier statements to Garcia, and a Long Beach City employee testified Miller was laid off by the city from June 1993 to June 1994.

stopped in 1988 after his brother died. Miller claimed Ceasar was not a gang member.[3]

Ceasar testified Sanders "took a swing" at him at the liquor store a week or so before the robbery after an exchange of words, and the police were called. Appellant was present and grabbed Sanders at one point. Ceasar was not arrested. Ceasar denied he ever "pack[ed]" a gun or had a gun in his possession on the Friday before the robbery.

During cross-examination Ceasar claimed he did not recall what appellant was wearing the day of the robbery, but it was too hot for a jacket. The prosecutor had Ceasar view portions of the videotape preceding the robbery. Ceasar identified appellant on the videotape and explained he could tell it was appellant by his body language and by his face. Ceasar denied appellant was nicknamed "Chocolate" and claimed no knowledge about gang affiliation.

Before rebuttal, defense counsel objected to the People calling the gang expert witnesses. Defense counsel argued there was no need for further gang affiliation testimony once Miller admitted his gang affiliation with appellant. The court overruled the objection.

In rebuttal, Officer Ken Sutton, an experienced police officer assigned to the Long Beach Police Department gang unit, testified appellant and Miller told him they were members of the "19th Street Insane Crips" in 1992. Appellant said his moniker was "Chocolate." Appellant had a tattoo on his arm, "ICG," which meant "Insane Crips Gang." Both appellant and Miller also had a "one" and a "nine" tattooed on their arms. At trial, Sutton examined appellant's arms. What was there was the tattoo, "LBC," not "ICG." Sutton testified "LBC" meant "Long Beach Crips."[4]

Officer Bertrum Sorenson, the veteran officer in the Long Beach Police Department responsible for gathering gang intelligence, testified he had interviewed about 5,000 gang members during his career. Sorenson opined gang members will provide alibis in court to protect fellow gang members. Sorenson also opined by 1985 most of the Black gangs in Long Beach, including the 19th Street Crips, had been absorbed into the Insane Crips Gang. The 19th Street Crips also called themselves the "Long Beach Crips." Because the Insane Crips gang had recently combined with the 19th Street

[3]During redirect examination, Miller claimed there were also lots of Samoans living in the area who were "Bloods." The Bloods' color was red; the Crips' color was blue. Miller claimed the 19th Street Crips did not associate with the Samoans.

[4]The parties stipulated appellant's arms were tattooed with the initials "LBC," as well as a "one" and a "nine."

Crips gang, it was possible an Insane Crip gang member would be tattooed with the initials, "LBC," and a "one" and a "nine."

## II. *Findings of Prior Serious Felony Convictions and Sentencing Proceedings*

Appellant was charged with two prior convictions of a serious felony under Penal Code section 667, subdivision (a)(1). The court found both enhancements to be true during a court trial as to the "priors." Only the prior conviction for felonious assault (Pen. Code, § 245, subd. (a)(1)) in People v. Davis (Super. Ct. L.A. County, No. NA004154) is in issue.

The People proved the "prior" in question with a Penal Code section 969b prison packet and the contents of the superior court file in People v. Davis, *supra*, No. NA004154.[5] In case No. NA004154, appellant pled guilty to the following allegations in the information: "On or about July 14, 1990, in the County of Los Angeles, the crime of ASSAULT GREAT BODILY INJURY AND WITH DEADLY WEAPON, in violation of PENAL CODE SECTION 245 (a)(1), a Felony, was committed by [appellant], who did willfully and unlawfully commit an assault upon MARIA M[] with a deadly weapon, to wit, HANDS, and by means of force likely to produce great bodily injury."[6]

Defense counsel urged "hands[,] per se," did not constitute the "use[] of a dangerous or deadly weapon" under Penal Code sections 667, subdivision (a)(1), and 1192.7, subdivision (c)(23). In finding the enhancement true, the court said: "Hands in a given case might constitute a deadly weapon" and found appellant's plea to be conclusive of the issue of whether appellant used a deadly weapon.

At sentencing, the court imposed an aggregate 18-year-4-month term for the offenses and enhancements. At the People's request, the court imposed only one Penal Code section 667, subdivision (a)(1), enhancement for

---

[5]Based on his conviction for felonious assault in People v. Davis, *supra*, No. NA004154, appellant was additionally charged with a prior prison term enhancement under Penal Code section 667.5, subdivision (b). That enhancement was also found true.

We granted the People's motion to have transmitted to this court the superior court file under California Rules of Court, rule 10(d). We take judicial notice of the contents of the superior court file. (Evid. Code, § 452, subd. (d).)

[6]The probation report prepared for sentencing was also in the superior court file. It contained a summary of the events of the assault indicating appellant asked the victim to have sexual intercourse with him and she refused. He tore off her blouse and fondled her breasts. Then he dragged her behind the residence and choked her. Appellant "caused bodily injury" and, as a result, the victim required medical attention. The victim was taken to the hospital. Appellant's admitted to the probation officer: "he was on his porch [and] the victim came to his house. . . . [S]he started fussing, and . . . he got her in a headlock."

People v. Davis (Super. Ct. L.A. County, No. NA012377) (a prior robbery) and struck the true finding as to the prior conviction for felonious assault in case No. NA004154. The court stated it was ordering the "prior" stricken "for purposes of sentencing." The court then imposed the enhancement for the prior prison term under Penal Code section 667.5, subdivision (b), for the "prior" in case No. NA004154.[7]

DISCUSSION

### I. *Use in Evidence of the Gang Testimony Was Harmless Error*

 Sorenson's opinion did not provide a basis for concluding the gang-affiliation testimony presented here was qualitatively different than other group bias evidence. The People's case was ironclad because appellant committed the robbery on videotape. Miller and Ceasar were impeached by their longtime association with appellant and impeached by other details in their trial testimony which suggested they were lying. This case presents no exception to the well-settled rule that the use at trial of cumulative evidence of bias in the form of gang-affiliation evidence constitutes an abuse of discretion. (*People* v. *Cardenas* (1982) 31 Cal.3d 897, 904-905 [184 Cal.Rptr. 165, 647 P.2d 569]; *People* v. *Maestas* (1993) 20 Cal.App.4th 1482, 1494-1498 [25 Cal.Rptr.2d 644].)

 In this case, the use in evidence of appellant's gang-affiliation evidence was utterly harmless. The employees who were robbed testified they recognized the robbers as regular customers of the liquor store. Appellant and his companion were videotaped committing the robbery and the jury was shown the videotape at the trial. Appellant's alibi was provided by longtime friends, and the People impeached the testimony of the alibi witnesses in several respects. The evidence of appellant's guilt was overwhelming, and it is not probable a different result would have been reached in the absence of the error. (*People* v. *Champion* (1995) 9 Cal.4th 879, 923 [39 Cal.Rptr.2d 547, 891 P.2d 93]; *People* v. *Maestas, supra,* 20 Cal.App.4th at pp. 1498-1501.)

### II. *An Assault With Hands Does Not Prove the "Personal Use of a Dangerous or Deadly Weapon"*

 Appellant contends his plea to the "prior" in the statutory language for felonious assault in the conjunctive and, specifically with his "hands,"

---

[7]The court imposed an aggregate term of eighteen years four months in state prison, consisting of: five years for the robbery in count 1, enhanced by five years for the use of a firearm; a consecutive one year for the robbery in count 2, enhanced by one year four months for the use of a firearm; five years consecutive for the prior conviction of a serious felony (the prior robbery conviction); and one year for the prior conviction (the prior felonies assault conviction), resulting in a prior separate prison term within the meaning of Penal Code section 667.5, subdivision (b).

does not show the "personal[] use of a dangerous or deadly weapon" required for a serious felony. We agree. The dangerous or deadly weapon must be an object or weapon extrinsic to the human body.

A conviction of Penal Code section 245, subdivision (a)(1), is not necessarily a conviction of a prior serious felony pursuant to sections 667 and 1192.7. In order for it to be so, the People must plead and prove defendant's personal use of a dangerous or deadly weapon. (*People* v. *Equarte* (1986) 42 Cal.3d 456, 465 [229 Cal.Rptr. 116, 722 P.2d 890].) *People* v. *Williams* (1990) 222 Cal.App.3d 911 [272 Cal.Rptr. 212], explained: "When the section 245, subdivision (a)(1), violation is based on an assault 'by any means of force likely to produce great bodily injury' it does not come within section 1192.7, subdivision (c)(23). Similarly, a defendant may be guilty of section 245, subdivision (a)(1) by aiding and abetting another who commits an assault using a deadly weapon. In neither case would the conviction constitute a serious felony within section 1192.7, subdivision (c)(23), because the defendant would not have 'personally used a dangerous or deadly weapon' as that section requires. Rather, a section 245, subdivision (a)(1), conviction can only 'constitute a serious felony [within section 1192.7, subdivision (c)(23)] if the prosecution properly pleads and proves that defendant personally used a deadly or dangerous weapon in the commission of the offense.' " (*Id.* at pp. 914-915, quoting from *People* v. *Equarte, supra,* 42 Cal.3d at p. 465.)

The court may examine the entire record of conviction to determine the substance of the prior conviction so as to prove the serious felony allegations which do not constitute elements of the crime. (*People* v. *Guerrero* (1988) 44 Cal.3d 343, 355 [243 Cal.Rptr. 688, 748 P.2d 1150]; *People* v. *Hayes* (1992) 6 Cal.App.4th 616, 622 [7 Cal.Rptr.2d 866].) Where a defendant enters a guilty plea constituting his voluntary admission he committed the acts alleged in the indictment, the plea unequivocally establishes the particular elements alleged were both raised and resolved. (*People* v. *Hayes, supra,* 6 Cal.App.4th at p. 623.)

There has been no occasion for a California court to determine if the hands and fists constitute a "deadly weapons or instrument" under Penal Code section 245, subdivision (a)(1). This is no doubt because the felonious assault statute alleges all aggravated assaults in one statute prohibiting both assault with "a deadly weapon or instrument" or " by means of force likely to produce great bodily injury." The courts simply have had no need to make a distinction between the two clauses since all aggravated assaults are ultimately determined based on the force likely to be applied against a

person.[8] (*In re Moseley* (1970) 1 Cal.3d 913, 919, fn. 5 [83 Cal.Rptr. 809, 464 P.2d 473]; *People* v. *McGee* (1993) 15 Cal.App.4th 107, 117 [19 Cal.Rptr.2d 12]; see *People* v. *Colantuono* (1994) 7 Cal.4th 206, 215 [26 Cal.Rptr.2d 908, 865 P.2d 704].) *People* v. *Duke* (1985) 174 Cal.App.3d 296, 302-303 [219 Cal.Rptr. 873], suggested, if hand, fists or unshod feet are the means employed, "normally" the assault is by means likely to produce great bodily injury. (See also 1 Witkin, Cal. Criminal Law (2d ed. 1988) Crimes Against the Person, §§ 417-419, pp. 478-479.) Thus, whether appellant can commit a public offense of assault with a deadly weapon with his hands presents an interesting issue of first impression, but one this court does not have to reach. (See *People* v. *McGee, supra*, 15 Cal.App.4th at pp. 114-115; *People* v. *Brookins* (1989) 215 Cal.App.3d 1297, 1303-1307 [264 Cal.Rptr. 240].)

The determinative issue in this case turns not upon the character of the assault admitted under Penal Code section 245, but upon the nature of the instrument used to commit the crime, that is, whether the phrase the "personal use of a dangerous or deadly weapon" in Penal Code section 1192.7 contemplates just that—"the use" of a weapon extrinsic to the body in the commission of the felony. This is an issue of statutory interpretation. The provisions in Penal Code sections 667, subdivision (a)(1), and 1192.7 arise from passage of Proposition 8. ■ In ascertaining the voters' intent, this "court must look to the language of the statute [in this case, the initiative] and 'accord words their usual, ordinary, and common sense meaning based on the language used and the evident purpose for which the statute was adopted.' " (*People* v. *Catelli* (1993) 227 Cal.App.3d 1434, 1448 [278 Cal.Rptr.2d 452], quoting *In re Rojas* (1979) 23 Cal.3d 152, 155 [151 Cal.Rptr. 649, 588 P.2d 789]; see also *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299]; *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 145-147 [197 Cal.Rptr. 79, 672 P.2d 862].)

■ To "use" a "weapon" means the use or employment of an object extrinsic to the body. Webster's Third New International Dictionary (1961) page 2589, defines "weapon," as follows: "1 : an instrument of offensive or defensive combat : something to fight with : something (as a club, sword, gun, or grenade) used in destroying, defeating, or physically injuring an enemy . . . 2 : an animal's claw, teeth, talon, spur or beak used as a means of attack. . . . 3 : a means of contending against another (has codes of honor, rules, beliefs and other [weapon]s to protect him on the trail—Donn Byrne) (a politician who uses character assassination as a political [weapon]

---

[8]Penal Code section 245, subdivision (a)(1), provides, "Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury shall be punished by imprisonment . . . ."

—Croswell Bowen . . . [¶] syn WEAPON and ARM indicate something used in combat as an instrument or means of attack or defense. WEAPON applies to anything used or usable in injuring, destroying, or defeating an enemy or opponent. ARM usu[ally] in the plural, signifies an instrument or object designed for or used in fighting . . . but is often restricted to the class of weapons wielded by the hand and arm (as swords, pistols, or rifles)."

The Webster's Ninth New Collegiate Dictionary (1986), page 1335, defines "weapon" as "1 : an instrument of offensive or defensive combat : something to fight with 2 : a means of contending against another."

Furthermore, we can trace the statutory language used in Penal Code section 1192.7, subdivision (c)(23), from Penal Code section 1203 and The Deadly Weapons Control Act. In 1927, the Legislature added to Penal Code section 1203, inter alia, a provision banning probation for defendants "who used, or attempted to use, a deadly weapon in connection with the perpetration of the crime." (Stats. 1927, ch. 770, § 1, pp. 1493-1494.) In 1975, Penal Code section 1203, subdivision (d)(2), prohibited probation, except in unusual cases, for "[a]ny person who used or attempted to use a deadly weapon, other than a firearm, upon a human being in connection with the perpetration of the crime of which he has been convicted." (Stats. 1975, ch. 1004, § 1, p. 2356.) Penal Code section 1203 retains the same language in pertinent part in its current form. (Pen. Code, § 1203, subd. (e)(2).)

With the change to the determinate sentencing law, Penal Code section 12022, subdivision (b), was added as part of Penal Code section 12022 in The Deadly Weapons' Control Law (Pen. Code, § 12000 et seq.). That provision provided for a one-year enhancement of the aggregate term where a defendant "personally uses a deadly or dangerous weapon in the commission or attempted commission of a felony." (Stats. 1977, ch. 165, § 91, p. 678, eff. June 29, 1977, operative July 1, 1977.)[9] Just before the passage of Proposition 8, the exact language of Penal Code section 1192.7, subdivision (c)(23), was added to the Penal Code by the Legislature in section 12021.1, another part of The Deadly Weapons' Control Law. (Stats. 1982, ch. 136, § 7, p. 447, eff. Mar. 26, 1982, operative Apr. 25, 1982.) In section 12021.1, a six-month minimum jail term was required for a current conviction of owning or possessing a concealable firearm, where the defendant had certain enumerated prior convictions of a felony, including "[a]ny felony in which the defendant personally used a dangerous or deadly weapon." (See *People v. Bradford* (1984) 160 Cal.App.3d 532, 538-544 [206 Cal.Rptr. 899], disapproved on another point in *People v. Equarte, supra,* 42 Cal.3d at pp.

---

[9]Penal Code section 12022, subdivision (b)'s statutory language, for all practical purposes, is the same as that in Penal Code section 1192.7. The words "dangerous" and "deadly" are inverted, however.

463-465 [discussing the statutory history of Pen. Code, § 1192.7, subd. (c)(23)].)

Then, almost simultaneously, on June 8, 1982, Proposition 8 was approved by the voters. Proposition 8 added both Penal Code section 667, subdivision (a), and the list of "serious" felonies in Penal Code section 1192.7. No one would dispute the use of the word "weapon" in Penal Code section 1203, or within The Deadly Weapons' Control Law, necessarily involves the use of an implement or object extrinsic to the body. The phrase "personally used a dangerous or deadly weapon" in section 1192.7 is substantially identical to that used in The Dangerous Weapons' Control Law and very similar to the probation limitation in Penal Code section 1203. Accordingly, we conclude the voters intended the very same usage when Proposition 8 employed that phrase in Penal Code section 1192.7.

It is also notable, in importing the "laundry list' of felonies from Penal Code sections 12021.1 to 1192.7, if that was what was done, the drafters omitted Penal Code section 12021.1's provision including felonious assault from within the list of "priors."[10]

The discussion of the California Supreme Court in *People* v. *Equarte*, *supra*, 42 Cal.3d 456, also reinforces our decision a weapon is a necessary element of a prior serious felony under Penal Code section 1192.7, subdivision (c)(23). *Equarte* rejected a claim Penal Code section 1192.7 required the pleading and proof in the prior serious felony of discrete crimes and enhancements rather than the specific conduct described in its provisions. *Equarte* also rejected the argument a Penal Code section 12022, subdivision (b), enhancement had to have been found true in the prior case before that prior conviction could be used as a prior serious felony conviction under Penal Code section 1192.7, subdivision (c)(23).

In reaching that decision, the *Equarte* court said: ". . . we conclude that under subdivision (c)(23), 'any felony'—including assault with a deadly weapon—may be found to constitute a serious felony if the prosecution properly pleads and proves that defendant personally used a deadly or dangerous weapon in the commission of the offense. Although the prosecution may establish the elements required by subdivision (c)(23) by pleading and proving a separate section 12022, subdivision (b) enhancement, a section 12022, subdivision (b) enhancement is not a necessary prerequisite to the application of subdivision (c)(23)." (*People* v. *Equarte*, *supra*, 42 Cal.3d at p. 465.)

---

[10]The enactments of Proposition 8 and Penal Code section 12021.1 were months apart. We assume, as did the *Bradford* court, the laundry list in section 12021.1 came first. (*People* v. *Bradford, supra*, 160 Cal.App.3d at pp. 53-539 and fn. 6.) The enactment of Penal Code section 12021.1 preceded the enactment of Proposition 8.

This passage from *Equarte* leaves little doubt the Supreme Court believed the "personal use of a dangerous or deadly weapon" involved the same elements as the enhancement for the personal use of a deadly or dangerous weapon within the meaning of Penal Code section 12022, subdivision (b), i.e., the use of a weapon or implement extrinsic to the human body.

It is also worth observing, in *People* v. *Dozie* (1964) 224 Cal.App.2d 474 [36 Cal.Rptr. 728], the court addressed the issue of whether a defendant's fist, used with sufficient force, may constitute a "dangerous or deadly weapon" for the purposes of the former first degree robbery statute.[11] *Dozie*'s conclusion fists did not constitute a dangerous or deadly weapon turns on the fact, by definition, "armed with a dangerous or deadly weapon" must involve the use of an external instrumentality. The word "armed" is not involved in the instant statute. However, it is useful to consider the *Dozie* court's thinking on this issue, and the decision, to the extent it is analogous, buttresses the conclusion an external object or instrumentality is necessary to the use of a dangerous or deadly weapon.

The court in *People* v. *Dozie, supra,* 224 Cal.App.2d at pages 475-477, said: "The question is one of first impression in this state. Several decisions hold that a shod foot, although not inherently a dangerous or deadly weapon, may be used as such, thus constituting an instrumentality of first degree robbery. [Citations.] Counsel for the People draw analogies to cases decided under Penal Code section 245 (" 'assault . . . with a deadly weapon or instrument or by any means of force likely to produce great bodily injury' "). There are many decisions holding that use of hands or fists will support an assault conviction under Penal Code section 245. All such decisions turn on the fact that hands or fists may be used with sufficient force to create great bodily injury, not that they fall into the class of deadly weapons or instruments. (See, for example, *People* v. *Hinshaw* [(1924)] 194 Cal. 1, 22, 27 [227 P. 156]; *People* v. *White* [(1961)] 195 Cal.App.2d 389, 392 [15 Cal.Rptr. 665]; 1 Witkin, Cal. Crimes, pp. 255-256.) Use of force likely to produce great bodily harm is not a determinative factor in first degree robbery, as defined by section 211a. Thus the assault cases are but a thin analogy.

"There are decisions in other states holding that fists are not a 'dangerous weapon.' These cases are not particularly helpful, being interpretations of particular criminal statutes. [Citations.]

---

[11]Former Penal Code section 211a stated: "All robbery which is perpetrated by torture or by a person being armed with a dangerous or deadly weapon, and the robbery of any person who is performing his duties as operator of any motor vehicle, streetcar, or trackless trolley used for the transportation of persons for hire is robbery in the first degree. All other kinds of robbery are of the second degree." (See Stats. 1976, ch. 1139, § 137.5, p. 5100, eff. Jan. 1, 1977, operative July 1, 1977.)

"There is a well-established classification of weapons for the purpose of the robbery statute. Weapons such as guns and blackjacks are designed for dangerous and deadly use; hence, as a matter of law, they establish first degree robbery. Other instrumentalities, such as razors, pocket knives and various sharp or heavy objects, are not weapons in the strict sense, yet may become such according to the manner of use; whether they constitute a 'dangerous or deadly weapon' is a question of fact for determination in each case. (*People* v. *Raleigh* [(1932)] 128 Cal.App. 105, 108-109 [16 P.2d 752]; see also *People* v. *Klimek* [(1959)] 172 Cal.App.2d 36, 41-42 [341 P.2d 722]; 1 Witkin, *op. cit.*, pp. 399-400.) That classification is not useful here. Even in the second group of cases, the offender is 'armed,' that is, he equips himself with some object, device or instrumentality extrinsic to his own body and capable of dangerous or deadly use. Obviously, human fists, just as much as any extrinsic weapon or instrument, may be used to accomplish deadly results. (See *People* v. *Toth* [(1960)] 182 Cal.App.2d 819, 833-835 [6 Cal.Rptr. 372]; *People* v. *Teixeira* [(1955)] 136 Cal.App.2d 136, 150 [288 P.2d 535].) The question is not whether the naked fists constitute a weapon, but whether the fist user comes within the statutory concept of one *armed* with a weapon.

"The phrase 'armed with a deadly weapon' means that the user is furnished or equipped with such a weapon. (*People* v. *Klimek, supra,* 172 Cal.App.2d at p. 41; *People* v. *Hall* [(1930)] 105 Cal.App. 359, 361 [287 P. 533].) In a sense, all who possess normal appendages are furnished or equipped with fists. Children, most women, many men, lack physical strength to use their fists to dangerous or deadly effect. Other persons possess the necessary strength. Arguably, persons in the first category are not armed with a dangerous weapon, while persons in the second category may be so armed if a brutal beating is the actual means of accomplishing a robbery. That notion would require the trier of fact to base his decision upon the degree of force actually used, usually by considering the character and extent of the victim's injuries. Such is the method employed to determine guilt of assault by means of force likely to produce great bodily injury under Penal Code section 245. (*People* v. *White, supra,* 195 Cal.App.2d at p. 392.)

"The statutory distinction between first and second degree robbery, in contrast, turns not so much on a judgment as to the degree of force actually inflicted upon the victim, as on the character of the instrumentality with which the offender is armed. The weapon need not be used at all. [Citations.] To classify a taking as first or second degree robbery according to a measure of physical power, brutality or injurious effect would run counter to the statute, which rests the judgment upon the character of the weapon with which the offender is equipped, not on gradations of power or injury. . . .

[¶] We conclude that one equipped only with his naked hands or fists is not armed with a dangerous or deadly weapon within the meaning of Penal Code section 211a."[12]

This court also concludes one equipped only with his naked hands or fists does not "personally use a dangerous or deadly weapon" under Penal Code section 1192.7, subdivision (c)(23), and, accordingly, find the evidence is insufficient to support the challenged serious felony enhancement. Nevertheless, there is no need to vacate the mandatory five-year term imposed for the enhancement. The court ignored Penal Code section 1385, subdivision (b)'s ban on the dismissal of prior convictions of serious felonies and struck the challenged prior "for purposes of sentencing." (See *People* v. *Valencia* (1989) 207 Cal.App.3d 1042, 1045 [255 Cal.Rptr. 180].) Thus, the enhancement was never imposed and there is nothing to correct.[13]

DISPOSITION

The judgment is affirmed.

Lillie, P. J., concurred.

**WOODS (Fred), J.,** Concurring.—I agree with the opinion of the court. I write separately to highlight the essence of the matter.

Since 1872 Penal Code section 245 has made two quite different kinds of assaults—felony assaults. Assaults "with a deadly weapon or instrument" are

---

[12]We also considered the decisions in *People* v. *Skeirik* (1991) 229 Cal.App.3d 444 [280 Cal.Rptr. 175] and *People* v. *Brookins, supra,* 215 Cal.App.3d 1297, addressing whether the prior findings of firearm use constituted "robbery involving use of a deadly weapon" within the meaning of Penal Code section 667.7. *Brookins* set forth a history of the term "deadly weapon" and its appearance in conjunction with the term "dangerous weapon." *Brookins* concluded, "in the absence of a special statutory definition, the term 'deadly weapon' has been construed to be limited to either instruments which are designed to be lethal (such as a loaded gun) or to dangerous implements which can be used in a lethal way (such as an unloaded gun used as a bludgeon)." (*Brookins, supra,* at p. 1307; see also *Sheirik, supra,* at p. 463.) The definition is not helpful to the discussion here since the *Brookins* and *Sheirik* courts assume the employment of a weapon and did not discuss any issue of an assault by means of body parts.

[13]We have read and considered the supplemental brief appellant filed personally on August 23, 1995. Therein, appellant complains of the use in evidence of the confrontation with the gun at the store on the Friday before the robbery was more prejudicial than probative and the prosecutor committed misconduct by eliciting prejudicial evidence about that incident. These contentions are without merit. There was no prosecutorial misconduct and the Friday incident was relevant to demonstrate the identity of the robbers and appellant's gun. In any event, any error was utterly harmless since the trial evidence so overwhelmingly established guilt. The verdict was not affected by that evidence. (*People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].)

a felony assault. So also are assaults *without* a deadly weapon or instrument but by "means of force likely to produce great bodily injury." Either type of assault may result in a felony conviction of Penal Code section 245, subdivision (a)(1).

At issue is whether or not the phrase "any felony in which the defendant personally used a dangerous or deadly weapon" (Pen. Code, § 1192.7, subd. (c)(23)) includes *both* types of felony assault described in Penal Code section 245, those committed with a weapon *and* those committed *without* a weapon.

I agree the most reasonable interpretation is that Penal Code section 1192.7, subdivision (c)(23), insofar as it applies to felony assaults, refers only to those committed *with* a weapon.

If the intent of Penal Code section 1192.7, subdivision (c)(23) was to include *both* types of felony assault, those with and those without weapons, less apt language can hardly be imagined. Moreover, if such was the intent, apt language was at hand: the disjunctive language of section 245, subdivision (a)(1).

By restricting the scope of Penal Code section 1192.7, subdivision (c)(23) to any felony where "the defendant personally used a dangerous or deadly weapon" the drafters clearly exempted less serious felonies where, e.g., a defendant falsely *claimed* to have a deadly weapon and those where he used a *non*dangerous "weapon." It also exempted, as here, a felony where *no* weapon was used.

Respondent's petition for review by the Supreme Court was denied May 1, 1996.